**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 15, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EDWARD J. KLEN, DIVERSE
CONSTRUCTION, INC., a Colorado
corporation; STEPHEN J. KLEN;
HOLSTEIN SELF-SERVICE
STORAGE, LLC, organized under
Colorado law,

        Plaintiffs-Appellants,

v.

CITY OF LOVELAND, COLORADO,
a Colorado municipal corporation;
THOMAS HAWKINSON, CITY OF
LOVELAND BUILDING OFFICIAL,
in his individual and official
capacities; GREG GEORGE, CITY OF
LOVELAND, COMMUNITY
SERVICES DIRECTOR, in his
individual and official capacities;
JOHN R. DUVAL, CITY OF
LOVELAND ATTORNEY, in his
individual official capacities;
KRISTINE BURNS, CITY OF
LOVELAND BUILDING PERMIT
COORDINATOR, in her individual
and official capacities; DAVID
SPRAGUE, CITY OF LOVELAND
PLANS REVIEWER, in his individual
and official capacities; CINDY
WORAYETH, CITY OF LOVELAND
EMPLOYEE, in her individual and
official capacities,

        Defendants-Appellees.

Nos. 10-1311 & 10-1327

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:07-CV-00347-RPM)**

---

Submitted on the briefs:[*]

Michael P. Zwiebel, Springer and Steinberg, P.C., Denver, Colorado, for Plaintiffs-Appellants.

Thomas J. Lyons, Esq., Malcolm S. Mead, Esq., Lance E. Shurtleff, Esq., Hall & Evans, L.L.C., Denver, Colorado, for Defendants-Appellees.

---

Before **O'BRIEN**, **ANDERSON**, and **HOLMES**, Circuit Judges.

---

**ANDERSON**, Circuit Judge.

---

Plaintiffs brought this civil rights action against the city of Loveland, Colorado (City) and various City employees, alleging a plethora of constitutional violations involving the defendants' alleged imposition of deliberate delays and unreasonable requirements for plaintiffs' building permit; solicitation of illegal and extortionate fees for the permit; selective prosecution for building without a permit; use of perjury in criminal ordinance violation proceedings; retaliation for

---

[*]   After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

-2-

plaintiffs' exercise of their First Amendment rights; forgery of plaintiffs' permit application to facilitate a wrongful prosecution; and trespassing by a building inspector. The district court granted summary judgment in favor of the defendants on plaintiffs' federal claims and declined to exercise supplemental jurisdiction over their state-law claims.[1] Plaintiffs appeal from the district court's award of summary judgment to defendants. We affirm in part, reverse in part, and remand.[2]

## BACKGROUND

Plaintiffs' claims arose out of their attempts to obtain a building permit from the City. After the permit was delayed, plaintiffs expressed increasing frustration with the delay by making vituperative and abusive comments to and concerning City employees and, according to the City, by conducting illegal and unauthorized construction without the permit. Plaintiffs contend the City retaliated by further delaying the permit, by issuing nearly sixty unjustified municipal citations to plaintiff Edward J. Klen (Ed Klen), by using perjury and forgery to prosecute Ed Klen, by trespassing on plaintiffs' work site, and by preventing City employees from patronizing plaintiffs' business.

---

[1]     Plaintiffs voluntarily dismissed their Equal Protection claims, and assert that they intended to dismiss their supplemental state law claims as well. *See* Aplt. Opening Br. at 5 n.4.

[2]     Case No. 10-1311 was initiated by plaintiff Edward Klen's notice of appeal. Case No. 10-1327 was initiated by the remaining appellants. We have consolidated these appeals for purposes of disposition.

## 1. The Anasazi Phase 2 Permit Applications

Plaintiffs Ed Klen and Stephen J. Klen are partners in plaintiff Holstein Self-Service, LLC (Holstein). They are also shareholders in plaintiff Diverse Construction, Inc. (Diverse). Holstein owns land in Loveland known as Anasazi Park, which it contracted with Diverse to develop.

In 2003, plaintiffs completed construction of a commercial project in Anasazi Park known as "Phase 1." Early in 2004, they began the process of obtaining City approval for a new commercial project in Anasazi Park, known as "Phase 2." Plaintiffs had two potential anchor tenants lined up for Phase 2: a martial arts studio (the "Oriental School of Mudu"), and a shooting range.

Contractors who construct buildings within the City must obtain approval for their structures. The City approves various phases of industrial construction in incremental stages by granting permits, inspecting work performed pursuant to these permits, and granting final approval based on successful inspection results. The City makes available several different types of building permits with differing requirements and different time frames for issuance. "Footing and foundation" permits allow a builder to pour the concrete foundation and footings for a building. "Core and shell" permits allow the builder to construct the core and shell of the structure. "Tenant finish" permits allow completion of the building so that it may be occupied by tenants. Finally, "special use" permits are

-4-

used where the builder intends to use a building for a purpose not permitted by existing zoning.

Anasazi 2 was not zoned for a martial arts studio or a firing range. Accordingly, when plaintiffs submitted their building permit application on July 6, 2004, they filed for both a tenant finish permit (allowing them to complete the structure from start to finish) and a special use permit. According to plaintiffs, defendant Thomas Hawkinson, the City's permit coordinator, suggested to them that things might move faster if they withdrew their application for a tenant finish and special use permit, and simply filed instead for a core and shell permit to get started on the building. This was because, under the City's municipal ordinances, plaintiffs could obtain a core and shell permit by right, whereas the City had discretion concerning whether to issue a special use permit and would impose strict requirements before issuing such a permit. Hawkinson's seemingly reasonable suggestion would lead to no end of trouble as things progressed.

Even now, there is considerable factual disagreement between the parties about the nature of the permit plaintiffs actually sought and the delays they endured in obtaining it. The City contends that rather than withdrawing their request for a special use permit, the Klens wanted both permit applications (core and shell and special use) to proceed simultaneously. In this way, they could obtain their special use approval quickly after they completed the core and shell

-5-

of Anasazi 2.  Following this logic, the City characterizes plaintiffs' complaints as *only* involving delays in obtaining the special use permit.  It then argues that plaintiffs have little cause for complaint about delays in receiving something to which they were not even entitled by law.  Plaintiffs respond that the delays they are complaining about involved the core and shell permit, to which they *were* entitled by law.  *See* Aplt. Reply Br. at 6.  Because there is evidence that supports plaintiffs' version of events sufficient to create a genuine factual dispute on this point, *see* Aplt. App., Vol. 1B at 325-26; Vol. 1D at 1141, 1264, 1292, we will assume for purposes of summary judgment analysis that it was the core and shell permit that was delayed.

### 2.  Permit Delays

Plaintiffs complain of unreasonable delays in obtaining their permit.  It is not entirely clear whether they attribute the initial delays to simple incompetence or to a pre-existing malicious or discriminatory attitude toward them by the City or its employees.  *See, e.g.,* Affidavit of James Cook, *id.* at 374 ("The speed and ease with which a builder's project and plans progressed through the permitting process at the City of Loveland often depended on whether the builder was part of an insider group. . . .Builders who were members of this group tended to be given preference, better treatment, and have their problems and concerns resolved more quickly"); Affidavit of Marlaine Maslen, *id.* at 378 ("The filing practices of the City of Loveland offices were bad.  Approximately 25 percent of building files

were temporarily lost and ten percent of the plans were permanently lost");
Second Amended Complaint, *id.* at 329 (alleging Cindy Worayeth with City's
planning department "possessed a malignant animosity toward [Ed Klen] and was
resolved to harm him if possible").  As time went on, however, plaintiffs allege
that the City's actions were motivated by animosity and a desire to retaliate
against them.

Plaintiffs allege that at the outset of the permitting process, Hawkinson and
other City officials told them that their core and shell permit would issue within
six to eight weeks.  Hawkinson also stated that the footing and foundation permit,
which would allow them to get started on the building, would be easy to obtain.
Acting on this information, plaintiffs applied for and obtained a construction loan
with an envisioned construction start date of September 2004.  On August 12,
2004, they resubmitted to the City their plans for a core and shell permit.
Plaintiffs began clearing the site and began preliminary work in late 2004.

Things did not go as swiftly as anticipated.  On September 14, 2004, David
Sprague, a plan reviewer for the City, indicated he would not approve plaintiffs'
permit application unless they submitted mechanical, plumbing, and electrical
drawings.  Plaintiffs contend this was an unreasonable requirement for approval
of their core and shell permit application because the drawings Sprague requested
could not be done until the tenant requirements were known, and thus these
requirements were part of tenant finish, not core and shell.  Plaintiffs also claim

the City's records show that when Sprague eventually approved the plans eight months later, he did so without the drawings.

On November 19, 2004, plaintiffs met with Hawkinson to determine when they could expect issuance of the permit. He told them he did not see any problems, and that they could continue doing the "dirt work" at the site for a few days until the permit issued. Three days later, on November 22, 2004, plaintiffs closed on the construction loan.

Plaintiffs assert that Hawkinson told them on December 1, 2004, that they could proceed with work on the building foundation even though no permit had yet been issued. According to two former City building inspectors who filed affidavits on behalf of plaintiffs and plaintiff's expert witness, the City routinely permitted builders to begin building before they were issued permits.

**3. The Stop Work Order**

On December 28, 2004, despite his prior verbal approval for work to commence, Hawkinson issued plaintiffs a stop work order (SWO). The order was served on plaintiffs by Inspector Richard Hoskinson during a concrete pour, which they were allowed to complete.

The next day, plaintiffs met with Hawkinson and Sprague about their permit and the SWO. They discovered that Sprague had not finished reviewing the plans they had submitted. When Sprague showed them the plans he had been reviewing, Steve Klen pointed out that these were the plans with tenant finish

submitted in July 2004. Sprague then claimed that he had never received the core and shell plans that plaintiffs had later submitted in August 2004. The Klens expressed frustration that Hawkinson and Sprague had not yet issued the appropriate permit. Hawkinson then told the Klens to continue working despite the SWO.[3]

### 4. The "Ghost Line" Problem

In December 2004, a surveyor informed the Klens that "a 'ghost line' which had been added to the [Anasazi] Phase I plat at the City's request had somehow been transformed by Larimer County into a property line." Aplt. App., Vol. 1D at 1158. Plaintiffs' attorney Richard Ball testified that in his experience this sort of issue has been easily resolved with the City in the past through issuance of a memorandum of understanding that would permit work to proceed while the plat was corrected. Plaintiffs assert that despite the City's initial approval of such a memorandum of understanding in early 2005, on March 19, 2005, City Attorney John Duval told Ball he was rejecting the memorandum.

On April 8, 2005, Duval told the Klens and their attorney that the plat issue could only be resolved by obtaining affidavits of correction from all the affected landowners. Plaintiffs resolved the plat issue on May 9, 2005, when their

---

[3]     In addition to the SWO served on December 28, 2004, the City contends that it posted SWOs at the construction site on March 28, 29, and 30, 2005, and on April 5, 2005.

attorney presented Duval with thirteen affidavits of correction. Duval then allegedly told plaintiffs they could resume work.

### 5. Additional Delays

In April 2005, plaintiffs allege that Sprague imposed new requirements for issuance of their permit. Sprague told plaintiffs they would have to submit elevations. When plaintiffs protested that they had already submitted elevations twice before with their July and August 2004 plans, Sprague told them he needed the documents stamped by their engineering firm. Plaintiffs contend this requirement was bogus because elevations do not need to be prepared by an engineer.

In May 2005, Colleen Cameron of the City Water Department told plaintiffs they would have to resubmit the water taps on their plans to show two three-quarter inch, rather than one, one-inch, tap. The Klens' engineer, Jeff Couch, told them he had never heard of such a thing and he expressed his opinion that the City was "just plain messing with you now." *Id.* at 1161. Nevertheless, the Klens submitted new plans with the water tap changes, delivering them on May 23, 2005, to Kristine Burns.

On May 31, 2005, Ed Klen called Colleen Cameron. She told him that she had not yet received the plans from Burns. When Ed called Burns, she told him she had lost the plans. According to plaintiffs, she also stated she had not intended to call the Klens to let them know that she had lost the plans. On June 3,

2005, Ed resubmitted the water tap plans in person. He told Burns he needed to get them to the water department immediately. Plaintiffs allege "Burns responded that it wasn't her problem and [stated] maybe Ed should just quit being a builder. Burns then turned to Ed and stated, 'contractors are dickheads.'" *Id.* at 1162.

After the water department signed off on the plans, on June 13, 2005, the Klens approached Burns again about their permit. She and Hawkinson told plaintiffs they would have to pay capital expansion fees (CEFs). The Klens assert that they showed Burns and Hawkinson municipal ordinances providing that CEFs were not due until final inspection for a certificate of occupancy, which would not be issued until the tenant finish was complete. The Klens also asked Burns to pull up the fee schedules on her computer; she claimed that they were unavailable.

Two days later, plaintiffs met with Duval. They contend that he told them they had never applied for a core and shell permit, and that a footing and foundation permit had been issued to them in January 2005. (Plaintiffs dispute whether the footing and foundation permit was issued.) Plaintiffs then met with Burns again. She provided them with a fee estimate that was approximately $125,000 more than the earlier estimate that her predecessor, Worayeth, had given them.

Plaintiffs allegedly told Burns her estimate was incorrect because she was charging them for a commercial use, whereas the core and shell permit was an

application for industrial use. They showed her a printout from 2004 in which the Department had estimated a fee based on industrial use that was $125,000 less than the one she was now quoting. Plaintiffs claim Burns then "tore up the printout and threw the pieces, stating, 'continue to piss me off and I'll double your fees . . . . Just bring your checkbook and shut up if you want your permit." *Id.* at 1163. The Klens later paid the fees (which actually were doubled) under protest, and a permit finally issued on June 16, 2005.

### 6. Confrontations with City Employees

The Klens allege they confronted various City defendants on many occasions during the permitting process between September 2004 and June 2005, each time expressing their frustration that the appropriate permit had not yet been issued, and at times using profane language and insults out of frustration. Plaintiffs describe the following specific confrontations involving City employees:

- In September 2004, Ed Klen confronted Sprague, telling him he must not have looked at the permit application or he would have known the drawings he was asking for were not required. He asked Sprague why he was lying and also demanded to know "what the hell was going on" in his department. Aplt. App., Vol. 1B at 330.

- In October 2004, Stephen Klen confronted Sprague and complained that Sprague was "treating us like shit" and couldn't "get [his] job done properly." *Id.*, Vol. 1D at 1132 (depo. pp. 182-83). The Klens "questioned the competence of both Sprague and Hawkinson, asking, 'when the hell are you going to get your shit together in this department?" *Id.*, Vol. 1B at 331 ¶ 62.

-12-

- In a December 2004 meeting with Hawkinson and Sprague, Ed Klen asked "[w]here is our damn permit?" *Id.*, Vol. 1D at 1142 (depo. p. 143).

- In March 2005, the Klens met with City manager Don Williams to complain about City Attorney John Duval and Hawkinson. During this meeting, Ed Klen called Duval a "boob." *Id.*, Vol. 1C at 948 (depo. p. 121). He stated that "Hawkinson was acting like an 'asshole' in running his department." *Id.,* Vol. 1D at 1158-59. Williams terminated the meeting, warning them "you're big boys and you know what you are getting into." *Id.* When they later met with Hawkinson, he stated "so I'm an asshole, huh? We'll see about that." *Id.* Two days later, Duval cancelled without explanation a mandatory neighborhood meeting required for their special review permit.

- On March 19, 2005, the Klens went to the Building Division and learned that nothing had been done on their permit application. They expressed their disgust for the management of the division. They were immediately called into Hawkinson's office, where he handed Ed Klen a citation for continuing work in violation of an SWO.

- On May 17, 2005, the Klens examined the Building Division's printout and came to the conclusion that it had been tampered with. They expressed their outrage, stating "they considered this to be 'ridiculous . . . bullshit' and demanded to know, 'where's our fucking permit?'" *Id.*, Vol. 1B at 338 ¶ 115. They were then called into Hawkinson's office, where Hawkinson attempted to serve twenty-one citations on Ed Klen, including tickets for working without a permit.

- On June 13, 2005, during a dispute about Capital Expansion Fees, Steve Klen asked Hawkinson, "what kind of idiot are you, if you can't even run your own goddamned department?" *Id.*, Vol. 1D at 1162. Two days later, during a meeting with Duval, Duval told them they had "made a, 'slap in the face of authority,'" for which they must pay. *Id.*

### 7.  Citations Issued to Ed Klen

By the time plaintiffs received their permit, the City had issued a total of nearly sixty citations to Ed Klen for working without a permit or in violation of the SWO. The citations often were served in large batches. Hawkinson served

the first citation on Klen on March 29, 2005, after the Klens expressed severe criticism of the Building Division's management. In April, plaintiffs' attorney informed them that twenty more citations for working without a permit and in violation of an SWO had been issued against Ed Klen. The attorney indicated that these citations could be resolved if they stopped work until the plat had been corrected. They complied, and did not return to work until May 10, 2005, after the plat issue had been resolved.

Later in May 2005, after plaintiffs expressed outrage that City officials had allegedly tampered with the official logs, Hawkinson called the Klens into his office and attempted to serve twenty-one additional tickets on Ed Klen for working without a permit. Ed refused to sign for them.

On May 23, 2005, Ed appeared in Loveland Municipal Court on the citations issued to him thus far. The hearing was postponed and Ed attempted unsuccessfully to reach a plea agreement with the City. On June 15, 2005, Duval informed plaintiffs that thirteen more citations had been issued against Ed Klen.

**8. Alleged Perjured Affidavit and Forged Permit Application**

Plaintiffs assert that in August 2005, Duval moved to add an additional thirty-four counts of violating a SWO to the existing citations for building without a permit, and to join all the counts for trial. Plaintiffs moved to dismiss

the citation proceedings for selective prosecution. They assert that in response to their selective prosecution argument,

> Duval solicited and presented to the Loveland Municipal Court a false affidavit by Thomas Hawkinson, in which Hawkinson stated untruthfully that he personally issued and served on Ed all the citations, that he never gave the Klens permission to proceed, that Ed was the only contractor ever discovered by City building officials to be building without a permit who continued to build after a stop work order issued, or after being verbally requested to stop work, and that Hawkinson had repeatedly advised Ed and Steve Klen to stop construction of the building until the permit issued.

*Id.* at 1164.

The Loveland Municipal Court denied Ed Klen's motion to dismiss. He subsequently accepted a plea bargain whereby he pleaded no contest to twenty counts and received a deferred judgment. He was ordered to pay a $20,000 fine plus court costs. The court imposed a one-year deferred sentence and judgment, and Ed had his contractor's license placed on probationary status for two years.

Plaintiffs contend that when they reviewed their file at the Building Division in March 2006, they discovered that their permit application had been replaced by one they had not prepared. The forged application contained materially different information from plaintiffs' previous applications. It showed Ed Klen's name as the applicant rather than Holstein's, and was signed with the forged signature of Ed Klen. Plaintiffs claim this was done in order to hold Ed Klen personally liable for the work giving rise to his criminal citations.

**9. Trespass by Hoskinson**

On May 3, 2005, plaintiffs served the defendants with their notice of intent to sue. Eight days later, a City building inspector, Richard Hoskinson, entered the premises of Anasazi Phase 2. Hoskinson entered the premises without a warrant or consent and without notice to plaintiffs. The Klens assert they stored personal items and machinery, supplies and tools inside the premises. They claim that Stephen Klen found Hoskinson eighty feet inside the building, going through their personal items and tools. Hoskinson told the Klens that no one had sent him and that he was just killing time. But plaintiffs allege that defendant Greg George told them the next day that he, Duval and Hawkinson had sent Hoskinson to conduct the inspection. Plaintiffs contend the inspection was in retaliation for their notice of intent to sue.

**10. Further Alleged Retaliation by City Employees**

Plaintiffs claim that the City continued its retaliatory actions against them for years after the permit issued. They assert that (1) Burns delayed in assigning addresses to plaintiff's property during 2006 and 2007; (2) Hawkinson improperly denied them a certificate of occupancy for the property in 2008; and (3) in June 2009, when the lessee of the firing range gave up the lease and the Klens took over the operation, Don Williams ordered Loveland police officers to stop using the range in order to deny the Klens the City's business.

## ANALYSIS

### 1. Standard of Review

"We review the grant of summary judgment de novo, applying the same standard as the district court . . . ." *Gwinn v. Awmiller*, 354 F.3d 1211, 1215 (10th Cir. 2004). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the record on summary judgment in the light most favorable to the nonmoving party. *Gwinn*, 354 F.3d at 1215.

### 2. First Amendment Retaliation Claim

Plaintiffs claim the City retaliated against them for their criticisms of City employees by taking a variety of maliciously motivated actions against them.[4] To successfully pursue a first amendment retaliation claim against a defendant who is not his employer, a plaintiff must establish the following elements:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's

---

[4] To the extent defendants assert that the only type of retaliation of which plaintiffs complain is the delay in obtaining their permit, we reject that construction of plaintiffs' complaint. In fact, plaintiffs complain that *many* of the City's actions were retaliatory.

adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000).

The district court concluded plaintiffs failed to establish even the first element of this test. It reasoned their "protestations were not public statements and were all within the context of interactions with the defendants. That is not protected speech." Aplt. App., Vol. 1D at 1479. This analysis is open to at least two interpretations: (1) the Klens' statements weren't constitutionally protected because they were made privately to the defendants; or (2) their statements weren't constitutionally protected because they didn't deal with matters of public concern. Defendants opt for the latter interpretation. We agree that this is likely the point the district court intended to make.

Thus clarified, however, the district court's reasoning contains a legal error that vitiates its analysis. Simply put, the Klens are private citizens, not public employees. The "matter of public concern" requirement therefore did not apply to them. *See Van Deelen v. Johnson*, 497 F.3d 1151, 1156 (10th Cir. 2007) ("[T]he [public concern] test quite properly applies to claims brought by government employees--but its scope reaches no further.").

Defendants attempt to salvage the district court's analysis, arguing that *Van Deelen* does not apply here because it involved the petition clause, not the speech clause, of the First Amendment. *See* Aplee. Br. at 13. But they supply no

principled distinction between the two clauses for purposes of determining the scope of the public concern requirement. As *Van Deelen* repeatedly emphasizes, the point of imposing a public concern requirement on the speech of government employees is that the government has a "need to maintain an efficient workplace in aid of the public's business." *Van Deelen*, 497 F.3d at 1156. This rationale applies as much to speech as it does to petitions for redress of grievances. *See Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2495 (2011) ("The substantial government interests that justify a cautious and restrained approach to the protection of speech by public employees are just as relevant when public employees proceed under the Petition Clause. Petitions, no less than speech, can interfere with the efficient and effective operation of government."). But this rationale does not apply to private individuals like the Klens.

Moreover, *Van Deelen*'s analysis draws no limiting distinction between the right to *petition* and the right to *speak*. Its analysis is deeply rooted in the context of First Amendment *speech*. For example, *Van Deelen* borrows its First Amendment retaliation test from *Worrell*, a case that involved alleged retaliation for *testimony in court* rather than for a petition addressed to the government. *See Van Deelen*, 497 F.3d at 1155-56; *Worrell*, 219 F.3d at 1200. *Van Deelen*'s discussion of the "public concern" requirement centers on *Pickering v. Board of Education*, 391 U.S. 563 (1968), a case involving public employee speech rather than petition rights. *See Van Deelen*, 497 F.3d at 1156. *Van Deelen* emphasizes

-19-

a broad "public employee" rationale for the "public concern" test, noting that "every case discussing the public concern test in the Supreme Court has made pellucid that it applies only to public employees." *Id.* at 1158.

Finally, it would be an odd thing to determine that private persons can freely petition the government concerning matters both public and private without fear of retaliation, but they cannot express an opinion on purely private matters in the course of their dealings with government employees with the same assurance of constitutional protection. We conclude that *Van Deelen* and the line of authority on which it relies apply here, and that plaintiffs' speech was not robbed of constitutional protection even if it involved only matters of private concern.

Alternatively, defendants argue that plaintiffs' speech deserved no constitutional protection because it was analogous to the "fighting words" denied First Amendment protection in *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942). In *Chaplinsky*, the appellant called a city official "a God damned racketeer" and a "damned Fascist." *Id.* at 569. He was convicted of violating an ordinance prohibiting persons from, among other things, addressing "any offensive, derisive or annoying word" to another person, or calling him "by any offensive or derisive name" with the intention to "deride, offend or annoy him, or to prevent him from pursuing his lawful business or occupation." *Id.* (quotation omitted). The Supreme Court rejected the appellant's claim of First Amendment protection, reasoning that "free speech is not absolute at all times

and under all circumstances" and that the First Amendment does not protect "'fighting' words--those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.* at 571-72.

More recently, we have explained that "fighting words" are "epithets (1) directed at the person of the hearer, (2) inherently likely to cause a violent reaction, and (3) playing no role in the expression of ideas." *Cannon v. City & Cnty. of Denver*, 998 F.2d 867, 873 (10th Cir. 1993). Given this standard, most if not all of the Klens' offensive epithets were not fighting words, because they did express ideas--chiefly that City building department officials were incompetent and were taking too long in processing plaintiffs' application for a building permit. Additionally, the words used by the Klens, objectively speaking, were also not those "likely to provoke the average person to retaliation, and thereby cause a breach of the peace," *Chaplinsky*, 315 U.S. at 573-74, particularly given the circumstances in which they were uttered.

Although the Klens used less-than-polite epithets in delivering their message, and occasionally even employed insulting terms to describe City officials, there is no indication that their words were accompanied by provocative gestures or threats. Nor did their use of vulgar or offensive language necessarily make their outbursts "fighting words." *See Lewis v. City of New Orleans*, 415 U.S. 130, 134 (1974). Words may convey anger and frustration without being likely to provoke a violent reaction. *Id.* at 135 (Powell, J., concurring).

-21-

Moreover, the context in which words were delivered is key in determining whether they would be viewed as a constitutionally-protected expression of opinion, as opposed to fighting words. *R.A.V. v. City of St. Paul,* 505 U.S. 377, 402 n.4 (1992) (White, J., concurring). As we will explain, some employees did not consider the Klens' behavior particularly shocking or memorable, given the rough-and-tumble world of the construction trade.

Certainly, words that constitute a "direct personal insult or an invitation to exchange fisticuffs" can be considered fighting words. *Texas v. Johnson*, 491 U.S. 397, 409 (1989). But here, the personal insults were either relatively mild (calling Duval a "boob" and Hawkinson an "idiot"), or voiced when the targets were not present (referring to Hawkinson as an "asshole").

There is also no indication in the record that the hearers of the Klens' epithets were incited to a breach of the peace. The reaction of actual hearers of the words constitutes significant probative evidence concerning whether the speech was inherently likely to cause a violent reaction. *See, e.g., Cohen v. California*, 403 U.S. 15, 20 (1971) ("There is . . . no showing that anyone who saw Cohen [wearing a jacket bearing the words "Fuck the Draft"] was in fact violently aroused or that [Cohen] intended such a result"). Cynthia Worayeth, for example, testified that she had no memory of the Klens behaving inappropriately. She remembered that Ed Klen had been upset at times, but felt that "it's always

been able to be resolved." Aplt. App., Vol. 1C at 902 (depo. p. 233). She simply noted that contractors "occasionally" get angry. *Id.*

Kristine Burns testified that she herself sometimes lost her temper with contractors and was profane with them. She didn't consider the Klens particularly difficult to deal with. She did note that City employees became "frustrated" with the Klens because the Klens "criticized everyone's job performance." *Id.* at 910 (depo. pp. 62-63).

Others were offended, at least, by the Klens' remarks. But there is no indication they were incited to immediate violence.[5] After a particularly contentious exchange, Don Williams told the Klens that they were big boys and knew what they were getting into. Tom Hawkinson responded to an insult by saying, "so I'm an asshole, huh? We'll see about that." Aplt. App., Vol. 1D at 1159.

In sum, we cannot conclude on this record that the Klens' statements, however offensive, were "inherently likely to cause a violent reaction," or "play[ed] no role in the expression of ideas." *Cannon*, 998 F.2d at 873. They were not "fighting words" denied First Amendment protection.

---

[5]     Mere offense, even if objectively justified, cannot be a sufficient basis for establishing fighting words. One does not usually retaliate unless offended. So if mere offense were enough to demonstrate the existence of fighting words *Chaplinsky* would arguably swallow the whole tort of First Amendment retaliation.

As a final fallback argument, defendants argue they are entitled to qualified immunity as to this claim, because "it was not clearly established in 2004-2005 that *speech* (as opposed to *petition*) addressing a private matter is protected by the First Amendment." Aplee. Br. at 47. "Qualified immunity protects governmental officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Weise v. Casper*, 593 F.3d 1163, 1166 (10th Cir.) (quotation omitted), *cert. denied*, 131 S. Ct. 7 (2010). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1155 (10th Cir. 2010) (quotation omitted). Although there does not need to be a "prior case[ ] with precisely the same facts," *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004), "[o]ur inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition," *Bowling v. Rector*, 584 F.3d 956, 964 (10th Cir. 2009) (internal quotation marks omitted). The pertinent question is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation." *Id.* (internal quotation marks omitted).

We reject defendants' qualified immunity argument concerning this claim. In *Van Deelen*, we made it clear, citing pre-2004 cases related to speech, that

-24-

"every case discussing the public concern test in the Supreme Court has made pellucid that it applies only to public employees." *Van Deelen*, 497 F.3d at 1158. Thus, it was clearly established prior to the conduct in question in this case that non-employee speech addressing a private matter was protected by the First Amendment.

The district court considered only the first element of the test for plaintiffs' First Amendment retaliation claim. Because we cannot agree with its analysis as to that element, we reverse the grant of summary judgment on the retaliation claim. We express no opinion concerning the remaining elements of this claim.

### 3. Substantive Due Process Claim

Plaintiffs' substantive due process claim has expanded over time. In their Second Amended Verified Complaint (SAVC), plaintiffs charged that the defendants "engaged in a continuous campaign of harassment, deceit, and delay against the Klens, intended to injure Ed and Steve Klen and their associates in a way unjustifiable by any government interest." Aplt. App., Vol. 1B at 351 ¶ 186. But the only specific adverse action alleged in the SAVC as part of the due process claim involved the City's delay in issuing plaintiffs a permit. *See id.*, ¶ 188. By the time of their summary judgment response, the claim had become something of a kitchen sink, containing many if not most of plaintiffs' grievances

against defendants.[6]  Even now, the parties cannot exactly agree on what this claim is about.  In their opening brief, plaintiffs summarize the factual basis for their claim as follows:

> [T]he defendants . . . engaged in a course of conduct that included unjustified delay in issuing the building permit, overcharging for and illegally collecting fees, an unprecedented issuance of criminal citations after officials had induced plaintiffs to engage in the conduct charged, demands for unnecessary documentation, obstruction of normal avenues for resolution of the plat issue, and forgery of the plaintiffs' building application.

Aplt. Opening Br. at 38.

---

[6]      In addition to complaints about delays in issuance of the permit, plaintiffs complained that they were compelled to pay Capital Expansion Fees long before they were due, Aplt. App., Vol. 1D at 1088; that Hawkinson issued citations to Ed Klen when he was unauthorized to do so, and that he was instructed to do so by Duval, *id.* at 1089, 1092; that Hawkinson falsely swore that the Klens had worked on days when they had not, and falsely swore that he had personally served the citations on Ed Klen, *id.* at 1089; that Hawkinson deliberately "posted" SWOs on the property rather than serving them as required, so that he could claim a violation when Ed did not know about the SWOs, *id.*; that other contractors were permitted to build without a permit, while Ed Klen was prosecuted for doing so, *id.*; that Ed was prosecuted for violating a stop work order even after Hawkinson effectively rescinded the order, *id.* at 1090; that Hawkinson attempted to force the Klens to cede their right to resist unauthorized inspections and to strip the Construction Advisory Board of its right to decide issues involving building codes, *id.* at 1091; that Duval refused to resolve the plat issue, *id.*; that Duval cancelled a neighborhood meeting in retaliation for the Klens' complaints, *id.* at 1092; that Duval wrongfully prosecuted Ed Klen based on invalid citations, invalid SWOs, and a forged permit application, *id.* at 1093; that Duval attempted to block plaintiffs' resort to the CAB and City Council, *id.*; and that City manager Don Williams conducted a "campaign of retaliation against the plaintiffs," *id.* at 1094.

-26-

Defendants, however, identify a different (but somewhat overlapping) pentacle of bad acts that they assert forms the framework for plaintiffs' substantive due process claim: (1) the delay in issuing their building permit; (2) Hawkinson's actions in first approving construction without a permit, then issuing a stop work order; (3) alleged forgery of the second application for a building permit; (4) the fraudulent affidavit submitted during the prosecution of Ed Klen; and (5) Hoskinson's trespass on their property. *See* Aplee. Br. at 24-26. In assessing whether the defendants' actions "shocked the conscience" and thereby were sufficiently serious to give rise to a substantive due process claim, *see County of Sacramento v. Lewis*, 523 U.S. 833, 846-50 (1998), we find it appropriate to consider both plaintiffs' and defendants' litany of bad acts.

The district court concluded that defendants should be granted summary judgment on this claim because plaintiffs failed to create a genuine issue of material fact concerning whether defendants' actions were "motivated by malice or ill will directed toward the plaintiffs." Aplt. App., Vol. 1D at 1475. Defendants argue that plaintiffs had no property interest in the building permit and that their alleged actions do not rise to the level of conscience-shocking behavior.

The "property interest" argument raises difficult factual issues involving the nature of the permit sought and delayed in this case ("core and shell" vs.

"special use permit").  Accordingly, it is not an appropriate basis for affirmance of the district court's grant of summary judgment as to this claim.

Defendants' second argument has more merit.  "[T]he due process clause is not a guarantee against incorrect or ill-advised government decisions."  *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1222 (10th Cir. 2006) (internal quotation omitted).  An arbitrary deprivation of a property right may violate the substantive component of the Due Process Clause if the arbitrariness is extreme.  *See id.* "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  *Id.* (internal quotation marks omitted).  A high level of outrageousness is required.  *See id.* at 1223.  As this court has stated:

> The ultimate standard for determining whether there has been a substantive due process violation is whether the challenged government action shocks the conscience of federal judges.  It is well settled that negligence is not sufficient to shock the conscience.  In addition, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power.

*See id.* at 1222 (internal quotation marks omitted).  These limits reflect the need to restrict the scope of substantive due process claims, the concern that § 1983 not replace state tort law, and the need to give deference to local policymaking bodies' decisions relating to public safety.  *See id.* at 1223.

Considered in light of the above standards, we conclude that the adverse actions of which plaintiffs complain do not rise to the level of

-28-

conscience-shocking behavior. Many of their complaints "are examples of the kind of disagreement that is frequent in planning disputes." *Eichenlaub v. Twp. of Ind.*, 385 F.3d 274, 286 (3d Cir. 2004) (affirming district court's dismissal of substantive due process claim which alleged "that zoning officials applied subdivision requirements to [plaintiffs'] property that were not applied to other parcels; that they pursued unannounced and unnecessary inspection and enforcement actions; that they delayed certain permits and approvals; that they improperly increased tax assessments; and that they maligned and muzzled the [plaintiffs' exercise of their First Amendment rights]").

Plaintiffs also allege that defendants employed fraud and forgery in connection with the prosecution of Ed Klen. We deal with this claim separately as a freestanding due process claim, *infra*. But to the extent Ed Klen seeks to advance a substantive due process claim based on defendants' conduct resulting in his guilty plea, we conclude that the alleged deprivations (payment of a fine and certain minimal restrictions imposed under the plea agreement) do not constitute "affronts to personal autonomy" sufficient to invoke a substantive due process remedy. *Becker v. Kroll*, 494 F.3d 904, 922-23 (10th Cir. 2007).

**4. Fourth Amendment Claim**

Plaintiffs complain that defendants George, Hawkinson and Duval violated the Fourth Amendment by ordering Hoskinson to conduct an unauthorized "special inspection" of the Anasazi Phase 2 premises to determine whether

-29-

unauthorized construction was going on.  The district court concluded that "[t]o the extent that the plaintiffs contend that Hoskinson's entry onto the property was an illegal search in violation of the Fourth Amendment, the facts do not support the claimed violation even if it is shown that Hawkinson directed the inspection." Aplt. App., Vol. 1D at 1477.  The district court did not describe the facts on which it relied, however, or why they did not support the claimed Fourth Amendment violation.

Defendants argue that summary judgment should be affirmed because "a trespass to property, negligent or intentional, is a common law tort; it does not infringe the federal constitution."  *Wise v. Bravo*, 666 F.2d 1328, 1335 (10th Cir. 1981).  In *Wise,* the plaintiff evoked only the common-law tort of trespass as the basis for his § 1983 suit and there is no indication he sought to advance a Fourth Amendment claim.  *Wise* certainly should not be read to stand for the proposition that a trespass *cannot* give rise to a claim under the Fourth Amendment.  *See, e.g., Reeves v. Churchich*, 484 F.3d 1244, 1258 (10th Cir. 2007) ("Of course, a police officer's mere entry or trespass into a home without consent is enough to constitute a search, often referred to in the case law as an 'unlawful entry.'").

While not every common-law trespass (into an open field, for example) violates the Fourth Amendment, a Fourth Amendment violation may be shown if the alleged trespass violated the plaintiff's "constitutionally protected reasonable expectation of privacy."  *United States v. Hatfield*, 333 F.3d 1189, 1195 (10th Cir.

2003) (quotation omitted). The threshold issue is thus whether plaintiffs had such a reasonable expectation of privacy in the premises of Anasazi Phase 2 searched by Hoskinson.

The defendants characterize the premises invaded as "the 'core and shell' of an unfinished commercial building," Aplee. Br. at 28, implying that plaintiffs had no reasonable expectation of privacy in the premises searched. Plaintiffs, while not denying the unfinished nature of the structure, stress the fact that "the Klens used the premises to store their wallets, briefcases and other personal belongings, and had installed doors and windows in order to secure the premises," Aplt. Opening Br. at 44-45. Plaintiffs do not argue that defendants knew they used Anasazi Phase 2 for storage purposes before dispatching Hoskinson to conduct the inspection.

Although plaintiffs correctly argue that "[t]he Fourth Amendment protects an individual's reasonable expectation of privacy in commercial premises," *United States v. Bute*, 43 F.3d 531, 536 (10th Cir. 1994), it is also true that "there is a lesser expectation of privacy in commercial as contrasted with residential buildings," *id.* An unfinished commercial building, such as the premises in question here, arguably affords even less of a reasonable expectation of privacy than the typical commercial premises.

That said, plaintiffs appear to have shown enough evidence of a Fourth Amendment violation to survive summary judgment on the question of whether

-31-

defendants violated the constitution. But the individual defendants also argue that they are entitled to qualified immunity as to this claim, and we agree. Plaintiffs have failed to show at the time defendants ordered Hoskinson to conduct an inspection of Anasazi Phase 2 that it was clearly established that this type of impromptu inspection of an unfinished commercial building, still under construction, violated their Fourth Amendment rights.[7] The individual defendants are therefore entitled to qualified immunity and we thus affirm the entry of summary judgment in their favor on this claim.

Plaintiffs also argue that the City is liable for the Fourth Amendment violation, because Hawkinson ordered the trespass in his capacity as decision-maker for the City, and George ratified it in his capacity as the City's Director of Community Services. A finding of qualified immunity in favor of city employees based on the lack of clearly established law does not shelter the city itself from liability. *See Jiron v. City of Lakewood*, 392 F.3d 410, 419 n.8 (10th Cir. 2004). Here, the district court only addressed the City's liability for plaintiffs' claims involving delay, finding that "the delay in this case was so different from what the Klens would expect from past experience of them and

---

[7]     In support of their Fourth Amendment argument, plaintiffs cite *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836 (10th Cir. 2005). But in that case the warrantless inspection was made of the office of a corporation located in an existing condominium complex, not an unfinished commercial building site as in this case.

others that it can only be explained by [Hawkinson's] intent to harm the plaintiffs' business. That defeats the claim against the City." Aplt. App., Vol. 1D at 1476. The district court did not discuss whether the City could be liable for the alleged Fourth Amendment violation resulting from Hoskinson's trespass under a theory that Hawkinson was the City's policymaker or that George ratified his actions. This was appropriate because the district court found no Fourth Amendment violation. *See id.* at 1477. Because we conclude, however, that plaintiffs have produced sufficient evidence of a Fourth Amendment violation to survive summary judgment, we reverse summary judgment in favor of the City and remand for further proceedings as to this claim.

### 5. Due Process Claim Based on False Evidence

Plaintiffs complain that "Hawkinson, with Duval's help, drafted and presented an affidavit that falsely claimed that no one had ever been permitted to proceed with construction after issuance of [a] SWO." Aplt. Opening Br. at 45-46. They also complain that Burns and others "forged the building permit application so as to substitute Ed Klen's name for that of the corporations, an act which identified Ed Klen as personally responsible for the construction, thus facilitating the personal prosecution of Ed Klen[.]" *Id.* at 46. This use of false evidence, they assert, violated Ed Klen's right to due process, providing him with § 1983 claims against defendants.

We agree with the district court that Duval, who is alleged only to have assisted with the preparation and presentation in judicial proceedings of an affidavit signed by Hawkinson, has prosecutorial immunity concerning this claim. *See Kalina v. Fletcher*, 522 U.S. 118, 129 (1997). We consider it only as it relates to the other defendants named in plaintiffs' complaint.

Defendants argue that Ed Klen's § 1983 claims based on the use of false or forged evidence are barred because his underlying conviction has not been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck v. Humphrey*, 512 U.S. 477, 487 (1994). Plaintiffs respond that *Heck* does not apply because "a petitioner who has no available remedy in habeas, through no lack of diligence on his part, is not barred by *Heck* from pursuing a § 1983 claim." *Cohen v. Longshore*, 621 F.3d 1311, 1317 (10th Cir. 2010). They assert that Ed Klen was never in custody and only paid a fine, and therefore never had an available remedy through habeas corpus, making *Heck* inapplicable. *See, e.g., Mays v. Dinwiddie*, 580 F.3d 1136, 1139 (10th Cir. 2009) ("[T]he payment of . . . a fine, absent more, is not the sort of significant restraint on liberty contemplated in the custody requirement of the federal habeas statutes" (quotation omitted)).

The *Heck* issue is slightly more complicated than plaintiffs suggest. While Ed Klen paid a fine, he also received a deferred judgment and sentence that

required him to "keep the Court advised of his current business and residential addresses and telephone numbers" and to "commit no other violations of Title 15 of the Loveland Municipal Code during the deferred period." Aplt. App., Vol. 1C at 1057. In the event of a breach of any of these conditions, the Loveland Municipal Court was empowered to enter judgment and impose sentence on his no-contest pleas. *Id.* According to plaintiffs, such a sentence could include incarceration of up to one year on each count. As Ed Klen described his sentence, he

> entered into a plea agreement and stipulation regarding his contractor's license under which he would plead 'no contest' to ten counts of Building Without a Permit, ten counts of Violation of a Stop Work Order, pay a $20,000.00 fine and court costs, enter into a one-year deferred sentence and judgment, and have his contractor's license placed on probationary status for two years.

*Id.*, Vol. 1D at 1164.

While "[a] prisoner need not be incarcerated to satisfy the custody requirement," *Mays*, 580 F.3d at 1139, he must still at least be subject to "restraints and conditions" that significantly restrain his liberty before a habeas remedy is available to him, *id.* While the restrictions imposed on Ed Klen as a result of his plea required him to do more than pay a fine, they do not appear to qualify as a significant restraint on his liberty sufficient to permit him to invoke a habeas remedy. Thus, his § 1983 claims concerning his conviction are not barred by *Heck*. Accordingly, we will proceed to the merits of these claims.

The district court granted defendants summary judgment on the false affidavit claim because "there [was] no causal connection between [the] affidavit and the outcome of the prosecution." Aplt. App., Vol. 1D at 1477. It reasoned that the affidavit "was relevant to the selective prosecution defense but not to the merits of the case which Ed Klen did not contest by proceeding to trial." *Id.* First, we cannot agree that a defendant's remedy under § 1983 for denial of due process based on the use of false evidence extends only to evidence presented as part of the prosecution's case at trial. Use of an indictment based on perjured testimony to bring charges, for example, itself represents a denial of due process. *Anderson v. Sec'y for Dep't of Corrs.*, 462 F.3d 1319, 1324 (11th Cir. 2006). Here, use of a perjured affidavit to defeat a defendant's attempt to dismiss an indictment on grounds of selective prosecution could also conceivably represent a denial of due process, notwithstanding the lack of a subsequent trial.

Second, Klen's no-contest plea did not preclude his claim about the use of false evidence. While as a general matter a guilty plea waives all nonjurisdictional challenges to a conviction, the preclusive effect of the plea in subsequent § 1983 proceedings is to be determined case-by-case under state law. *See Slayton v. Willingham*, 726 F.2d 631, 634 (10th Cir. 1984) (applying Oklahoma law on preclusive effect of guilty pleas in § 1983 case). Under Colorado law, a no-contest plea, unlike a guilty plea, does not estop the defendant from denying fault in a later civil action. *See Allen v. Martin*, 203 P.3d 546,

-36-

561-62 (Colo. App. 2008). In any event, there is no indication that Ed Klen admitted as part of the plea proceedings in municipal court that the allegedly perjured affidavit concerning selective prosecution contained only true statements or that he conceded as a factual matter that the prosecution had not been brought in an unconstitutionally selective manner. Such issues were collateral to the question of his guilt of the offenses to which he pleaded, and therefore were not waived a fortiori by the entry of his no-contest plea. We therefore conclude that Ed Klen's no contest plea does not foreclose his due process challenge to the knowing use of a perjured affidavit to defeat his defense of selective prosecution.

As a factual matter, we also cannot agree with the district court's conclusion that there was no causal connection between the affidavit and the outcome of the prosecution. It is not possible to determine on this record whether, absent the affidavit, the state municipal court would have dismissed the prosecution against Ed Klen, obviating the need for a no contest plea to avoid the possibility of a trial and even of jail time for the offenses. We therefore reverse summary judgment as to this claim.

As for plaintiffs' other assertion, that Burns and others forged the building permit application to substitute Ed Klen's name for that of the corporations in order to facilitate his prosecution, the record contains nothing but speculation to support this assertion. The district court therefore properly granted summary judgment as to this claim.

-37-

**CONCLUSION**

The judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings in accordance with this opinion.

10-1311 & 10-1327, Klen, et al. v. City of Loveland, et al.

**O'BRIEN**, J.  Concurring.


I join the court's very able opinion.  I write separately only to expand upon the discussion of one issue.

The majority says "We agree with the district court that Duval, who is alleged only to have assisted with the preparation and presentation in judicial proceedings of an affidavit signed by Hawkinson, has prosecutorial immunity concerning this claim.  *See Kalina v. Fletcher*, 522 U.S. 118, 129 (1997)."  Majority Op. at 33.  I wholeheartedly agree, but think a more fulsome discussion of absolute prosecutorial immunity is in order.

In *Kalina v. Fletcher* the prosecutor, Kalina, was seeking a warrant for the arrest of Fletcher.  Among other documents she filed with the court was a certificate summarizing the evidence against Fletcher; she personally attested to the truth of those summarized facts.  Based on those facts a judge found probable cause and issued the requested warrant.  Fletcher was arrested and jailed for a day.  The charges against him were dismissed a month later.  As it turned out some of the certified facts were either not true or not entirely true.  After the charges against him were dismissed Fletcher brought a 42 U.S.C. § 1983 action against Kalina seeking damages for her part in violating his constitutional right to be free from unreasonable seizures.  The issue before the Supreme Court was whether Kalina was entitled to absolute prosecutorial immunity, which would

completely insulate her not only from liability for her part in Fletcher's improper

arrest and incarceration but from even being subject to suit.

The court traced the history and reasons for absolute prosecutorial

immunity and summarized:

> These cases make it clear that the absolute immunity that protects the
> prosecutor's role as an advocate is not grounded in any special
> "esteem for those who perform these functions, and certainly not
> from a desire to shield abuses of office, but because any lesser
> degree of immunity could impair the judicial process itself." *Malley
> [v. Briggs]*, 475 U.S. [335,] 342, 106 S.Ct. [1092,] 1097 [(1986)].
> Thus, in determining immunity, we examine "the nature of the
> function performed, not the identity of the actor who performed it."
> *Forrester v. White*, 484 U.S. 219, 229, 108 S.Ct. 538, 545,
> 98 L.Ed.2d 555 (1988).

*Kalina*, 522 U.S. at 127.

> It then addressed Kalina's situation, saying:

> [Kalina's] activities in connection with the preparation and filing of
> two of the three charging documents-the information and the motion
> for an arrest warrant-are protected by absolute immunity. Indeed,
> except for her act in personally attesting to the truth of the averments
> in the certification, it seems equally clear that the preparation and
> filing of the third document in the package [the affidavit of probable
> cause] was part of the advocate's function as well. The critical
> question, however, is whether she was acting as a complaining
> witness rather than a lawyer when she executed the certification
> "[u]nder penalty of perjury."

*Id.* at 129.

Because Kalina was acting as a complaining witness, rather than an

advocate in an active case, the Supreme Court concluded she was not entitled to

absolute immunity. Of course, she would still be free to argue for qualified immunity.

We confronted a slightly different claim of absolute immunity in *Mink v. Suthers*, 482 F.3d 1244 (10th Cir. 2007). In that case Mink sued, among others, a deputy district attorney who, pursuant to statute, reviewed an affidavit for a search warrant prepared by an investigating officer before it was presented to a judge. Relying on the affidavit the officer obtained a warrant, which unconstitutionally permitted a search of Mink's home and computer. In considering the deputy D.A.'s claim to absolute immunity we reviewed and summarized the applicable law as follows:

> [A] prosecutor is entitled to absolute immunity for those actions that cast him in the role of an advocate initiating and presenting the government's case. Absolute immunity, however, does not extend to those actions that are investigative or administrative in nature, including the provision of legal advice outside the setting of a prosecution. *See Imbler [v. Pachtman]*, 424 U.S. [409,] 430-31, 96 S.Ct. 984; *Burns [v. Reed]*, 500 U.S. [478,] 486, 493-94, 111 S. Ct. 1934 [(1991)].

*Mink*, 482 F.3d at 1261-62.

We concluded the deputy D.A. was not entitled to absolute immunity because her role in giving advice to the police (passing on the form and substance of the affidavit) was unquestionably that of a lawyer, but was not part of an active prosecutorial function:

> Under the Supreme Court's functional approach, we look to which role the prosecutor is performing-advocate or investigator. Here, the

> review of the affidavit squarely falls on the side of investigatory legal advice, and not advocacy before a judicial body. The deputy district attorney played no role in preparing the affidavit, nor was she involved in preparing, analyzing, and presenting pleadings to a court. <u>If she were, this would be quite a different case</u>.

*Id.* at 1262 (emphasis added). We did not speak to qualified immunity as that issue was not part of the appeal.

This is that "quite different" case alluded to in *Mink*. Ed Klen moved to dismiss a pending criminal case against him. In opposing the motion to dismiss Duval presented to the court (and allegedly assisted in drafting) an affidavit signed by Thomas Hawkinson. His acts were clearly those of an advocate in an active case. He is entitled to absolute immunity.