**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 31, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

RICK CAMUGLIA, doing business as
Paisano's Restaurant,

        Plaintiff - Appellant,

    v.

THE CITY OF ALBUQUERQUE;
THE ALBUQUERQUE
ENVIRONMENTAL HEALTH
DEPARTMENT; GUY
WORTHINGTON, in his individual
capacity and as an employee of the
City of Albuquerque,

        Defendants - Appellees.

No. 05-2128

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. CIV-04-48-JB/LFG)**

---

David M. Berlin, Duhigg, Cronin, Spring & Berlin, P.A., and Melissa Stephenson,
New Mexico Victim's Rights Project, Albuquerque, New Mexico, for the Plaintiff
- Appellant.

Randy M. Autio, Assistant City Attorney (Peter S. Augh, Assistant City Attorney,
with him on the brief), Albuquerque, New Mexico, for the Defendants -
Appellants, The City of Albuquerque and The Albuquerque Environmental Health
Department

Patrick D. Allen (April D. White, with him on the brief), Yenson, Lynn, Allen &
Wosick, P.C., Albuquerque, New Mexico, for the Defendant - Appellee, Guy
Worthington

Before **LUCERO**, **BALDOCK**, and **HARTZ**, Circuit Judges.

**HARTZ**, Circuit Judge.

Rick Camuglia appeals a summary judgment rejecting his claim that he was denied substantive and procedural due process when his restaurant was temporarily shut down for alleged health code violations. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I.   BACKGROUND

The evidence before the district court was as follows: On February 19, 2003, Guy Worthington, an employee of the Albuquerque Environmental Health Department (EHD), inspected Paisano's Restaurant, owned by Mr. Camuglia. Mr. Worthington cited the restaurant for several violations, including cockroaches. Mr. Camuglia told Mr. Worthington that the insect problem would be immediately remedied, and invited him to return the next morning to reinspect the premises.

Mr. Camuglia contacted Glen Waters of AACTION Pest Control, who had applied pesticides regularly at Paisano's for some time. The following morning Mr. Waters began applying ULD 300, a pesticide that is approved for use in restaurants but can be hazardous to humans. The "Directions for Use" on the product label begin: "Do not apply directly to food. Food should be removed or

-2-

covered during treatment. Do not apply while food processing is underway. All food processing surfaces and equipment should be covered or washed with an effective cleaning compound followed by a potable water rinse." Aplt. App. at 58. The directions also state: "Close room or warehouse and shut off all ventilating systems. . . . Do not remain in treated areas after application, and leave room closed for at least one hour. Ventilate thoroughly before occupants are allowed to re-enter." *Id*.

Mr. Waters testified in his deposition that no ventilating systems were on and there was nobody in the restaurant when he began applying the ULD 300; that it was his practice to close all doors in a building before he began spraying; and that he did not see any exposed food in Paisano's. He also testified that although the ULD 300 spray settled on food-preparation areas and tables, Paisano's employees knew that it was their responsibility to "wash everything . . . after we left. That was a standing rule that we had always talked about, before we ever did anything in that restaurant. . . . By that time, they pretty much knew what the deal was. This wasn't the first time I was there to do that kind of work." Aplt. App. at 86. "[A]nybody that I work with there," he continued, "knew not to be in there when I was doing this. . . . They knew they couldn't be in there for at least an hour. I told them two hours just to be on the safe side." *Id*. He added that while he was spraying he did not see anyone in the restaurant until Mr. Worthington entered.

Mr. Worthington arrived after Mr. Waters had begun applying the pesticide. His account contradicts Mr. Waters's account in several respects. He swore in an affidavit that

> the back door of the facility was wide open and people were freely entering and exiting the facility without regard for the presence of chemicals. No notice was posted of the on-going fumigation. No effort had been made to cover food, food preparation areas, tables, or even the salt and pepper shakers. Out of concern for public safety, I requested that all employees exit the restaurant and asked to see the warning label for the pesticide being used.

Aplt. App. at 53-54.

Mr. Worthington concluded that the ULD 300 was not being applied in accordance with its warning label. He contacted his supervisor and together they decided to suspend Paisano's food-service permit temporarily. *See* Albuquerque, N.M., Code of Ordinances ch. 9, § 9-6-1-13(A) (1988) (hereinafter "Albuquerque Code") ("It shall be unlawful for any person to operate a food-service or food processing establishment within the city who does not possess a valid permit issued to him by the enforcement authority); *id*. at § 9-6-1-13(C) ("Permits may be suspended by the enforcement authority for failure of the holder to comply with the requirements of [the Code] or of other applicable laws, regulations or ordinances."). He then returned to his office and prepared an inspection report which, in accordance with EHD policy, was faxed to local media outlets. *See id*. at § 9-6-1-12(C) ("Whenever an inspection of a food-service . . . establishment is made, the findings shall be recorded on an enforcement authority inspection

-4-

form. . . . The completed inspection report form is a public document that shall be made available for public disclosure at the enforcement authority's office to any person who requests it."). As a result, members of the media came to Paisano's that day and reported on the suspension of Paisano's permit. The following day, February 21, 2003, Mr. Worthington reinspected Paisano's and reactivated its permit after concluding that any food that had been exposed to the pesticide had been discarded and that the food preparation surfaces had been cleaned.

Also on February 21, Steve Baca, an inspector for the New Mexico Department of Agriculture, which has oversight responsibility for pesticide application, conducted an investigation to see whether the ULD 300 had been properly applied. His report repeats the essential facts set forth above: (1) Mr. Worthington was concerned that the ULD 300 was not being properly applied; (2) it was Paisano's standard practice to wash all food preparation surfaces after application of the pesticide; (3) any uncovered food had already been thrown out; and (4) during past applications Mr. Waters had discussed with Paisano's employees that they must remain outside during the application of the pesticide and clean the premises after application, but this was not discussed before this application. In addition, Mr. Baca took three swab samples from within the restaurant. He testified in his deposition that pesticide was "detected on the kitchen electric box and the salad area light fixture, but not on the specials

board in the dining area." Aplt. App. at 110. He did not test the areas that he was told had been cleaned, "like food prep areas, dishes, and any areas close to the food." *Id.* at 109. His inspection report states that he "noted a violation because the operator should have clearly told Mr. Worthington and the restaurant staff that nobody was allowed into the treated area for one hour." Aplt. App. at 65. When asked at his deposition whether anyone had entered before one hour had expired, he responded: "That's what it sounded like. No specific times were given, but it sounded like pesticide application was stopped, [employees] were showing up right around that time or soon after, that they were told to go in and clean up, and that was about it pretty much." *Id.* at 63. He further testified that he believed that it was Mr. Worthington who had directed the employees to go into the restaurant to clean, but faulted Mr. Waters because "he needed to make it clear that nobody be in there, . . . ." *Id.*

Mr. Camuglia filed suit in the United States District Court for the District of New Mexico. His Second Amended Complaint for Deprivation of Property Without Due Process alleges three causes of action. The first, which is the only one at issue on appeal, raises a claim under 42 U.S.C. § 1983 that the City of Albuquerque (City), EHD, and Mr. Worthington deprived him of due process of law. It asserts that the application of the pesticide was not improper, and that Mr. Worthington acted "without permitting Plaintiff or its representatives to contest the alleged violations, something they had a right to do as a matter of

-6-

law." Aplt. App. at 24. It further asserts that "Worthington's acts were intentional, willful and wanton and meant to deprive Plaintiff of property rights . . . ." *Id.* at 25. In their motion for summary judgment the defendants treated this cause of action as alleging deprivations of both procedural and substantive due process. Mr. Camuglia did the same in his response memorandum, and the district court also addressed both claims. We will therefore treat the complaint the same way. (The second cause of action makes the same allegations against the same defendants under the due process clause of the New Mexico Constitution; and the third cause of action is a libel claim against an EHD employee. The district court granted summary judgment on the state constitutional claim; and the libel claim was dismissed by Mr. Camuglia with prejudice.)

Mr. Worthington moved for summary judgment on the § 1983 claims. He asserted that he was entitled to qualified immunity because there was no constitutional violation and, in the alternative, no violation of clearly settled law. The district court agreed on both grounds and granted the motion.

At a later hearing the City orally moved for summary judgment. Mr. Camuglia conceded that "[t]he case law is clear, if the underlying individual's out, then the municipality is also out." Aplt. App. at 205. Shortly thereafter the district court granted summary judgment to the City (apparently

treating EHD and the City as the same party, a course we also take).

Mr. Camuglia appeals only the adverse judgments on the § 1983 claims.

## II.   DISCUSSION

"We review the grant of summary judgment de novo, applying the same standard the district court should apply under Fed. R. Civ. P. 56(c)." *Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995).  Ordinarily, the district court must "view the record in the light most favorable to the party opposing summary judgment" and should grant summary judgment only "when there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted).  This standard applies to the City's motion for summary judgment.  It is somewhat modified with respect to Mr. Worthington, however, because he has asserted qualified immunity.  We now turn to the claims against Mr. Worthington, first explaining the effect of his assertion of qualified immunity.

### A.   Claims Against Mr. Worthington

#### 1.   Qualified Immunity

Under the qualified-immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "[T]he affirmative defense of qualified

immunity . . . protects all but the plainly incompetent or those who knowingly violate the law." *Medina v. Cram*, 252 F.3d 1124, 1127 (10th Cir. 2001) (internal quotation marks omitted). In contrast to a typical motion for summary judgment, which places the initial burden on the moving party, a motion based on a claim of qualified immunity imposes that burden on the plaintiff:

> When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, who must first establish that the defendant violated a constitutional right. If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. If, on the other hand, a violation has been shown, the next step in the qualified immunity sequence is to ask whether the constitutional right was clearly established. . . . The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation.

*Cortez v. McCauley*, 438 F.3d 980, 988 (10th Cir. 2006) (internal quotation marks and citations omitted). Thus, we now turn to whether Mr. Camuglia has presented evidence that would establish the violation of a constitutional right. As noted, he claims violations of both procedural and substantive due process. We start with his procedural-due-process claim.

### 2. Procedural Due Process

Mr. Camuglia contended in district court that his procedural-due-process rights were "violated . . . when [Mr. Worthington] closed Paisano's and notified the media without providing Mr. Camuglia with any level of process." Aplt. App.

at 75.  The district court disagreed, determining that Mr. Worthington's actions

were in accordance with Albuquerque Code ch. 9, § 9-6-1-13(C), which states:

> Notwithstanding the other provisions of §§ 9-6-1-1 et seq., whenever
> the enforcement authority finds an imminent health hazard or other
> conditions in the operation of a food-service or food processing
> establishment which, in his judgment, constitute a *substantial hazard
> to the public health*, he may without any prior warning, notice, or
> hearing, issue a written notice to the permit holder or operator citing
> such condition, specifying the corrective action to be taken, and
> specifying the time period within which action shall be taken; and, if
> deemed necessary, such order shall state that the permit is
> immediately suspended and all food-service or food processing
> operations are to be immediately discontinued.  Any person to whom
> such an order is issued shall comply immediately therewith.  An
> opportunity for a hearing will be provided if a written request for a
> hearing is filed with the enforcement authority by the permit holder
> within five working days.  The hearing shall be held within five
> working days after the date of the filing of the written request for the
> hearing.

(emphasis added).  Mr. Camuglia conceded to the district court that this ordinance

is constitutional.  He argued, however, that Mr. Worthington's actions were not in

accordance with the ordinance because there was no "substantial hazard."  The

district court's order rejected this argument:

> Camuglia disputes whether in fact there was a "substantial
> hazard" to the public.  He does not, however, dispute that
> Worthington, "in his judgment," concluded there was a substantial
> hazard and decided suspending Camuglia's license was in the interest
> of public safety.  [The ordinance] authorized Worthington to use his
> discretion.  A mere misapplication or violation of a city ordinance
> does not become a violation of federal due process rights.

*Camuglia v. City of Albuquerque*, 375 F.Supp.2d 1299, 1309 (D.N.M. 2005).  The

district court therefore held that Mr. Camuglia was not deprived of procedural due

process. Although our analysis is somewhat different, we agree with the district court's conclusion.

"We engage in a two-step inquiry [in determining whether an individual's procedural-due-process rights were violated]: (1) Did the individual possess a protected property interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?" *Clark v. City of Draper*, 168 F.3d 1185, 1189 (10th Cir. 1999) (internal quotation marks omitted). On this appeal we are not concerned with the first step because Mr. Worthington concedes that Mr. Camuglia had a protected property interest.

As for the second step, ordinarily one who has a protected property interest is entitled to some sort of hearing before the government acts to impair that interest, although the hearing need not necessarily provide all, or even most, of the protections afforded by a trial. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (the type of hearing required depends on (1) the nature of the private interest at stake; (2) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (3) the government's interest, and the burdens that additional procedures might impose). But "due process is flexible and calls [only] for such procedural protections as the particular situation demands." *Id*. at 334 (internal quotation marks and brackets omitted). For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate." *Clark,* 168 F.3d

-11-

at 1189; *see also Spielman v. Hildebrand*, 873 F.2d 1377, 1385 (10th Cir. 1988) (removal of child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." (internal quotation marks omitted)).

In matters of public health and safety, the Supreme Court has long recognized that the government must act quickly. Quick action may turn out to be wrongful action, but due process requires only a postdeprivation opportunity to establish the error. In *North American Cold Storage Co. v. City of Chicago*, 211 U.S. 306, 315 (1908), the Supreme Court rejected the argument that the city was required to have a hearing before seizing putrid poultry:

> The general power of the state to legislate upon the subject embraced in the above ordinance of the city of Chicago, counsel does not deny. Nor does he deny the right to seize and destroy unwholesome or putrid food, provided that notice and opportunity to be heard be given the owner or custodian of the property before it is destroyed. We are of opinion, however, that provision for a hearing before seizure and condemnation and destruction of food which is unwholesome and unfit for use is not necessary. The right to so seize is based upon the right and duty of the state to protect and guard, as far as possible, the lives and health of its inhabitants, and that it is proper to provide that food which is unfit for human consumption should be summarily seized and destroyed to prevent the danger which would arise from eating it. The right to so seize and destroy is, of course, based upon the fact that the food is not fit to be eaten. Food that is in such a condition, if kept for sale or in danger of being sold, is in itself a nuisance, and a nuisance of the most dangerous kind, involving, as it does, the health, if not the lives, of persons who may eat it.

(internal citation omitted). This holding has been repeatedly reaffirmed. *See, e.g., Mackey v. Montrym*, 443 U.S. 1, 17 (1979) ("We have traditionally accorded the states great leeway in adopting summary procedures to protect public health and safety. States surely have at least as much interest in removing drunken drivers from their highways as in summarily seizing mislabeled drugs or destroying spoiled foodstuffs."); *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679 (1974) ("[D]ue process is not denied when postponement of notice and hearing is necessary to protect the public from contaminated food . . . ."); *Fuentes v. Shevin*, 407 U.S. 67, 91-92 (1972) ("[T]he Court has allowed summary seizure of property . . . to protect the public from . . . contaminated food.").

We have followed these precedents in this circuit. In *Clark* a child was scratched by two blue foxes while on a school field trip to a petting zoo. His mother took him to the emergency room, and a local animal control officer was contacted. The officer learned that the foxes were considered "wild" under state law for purposes of rabies control, and are required to be tested whenever they bite or scratch a person. A city judge issued an order of impoundment without notice to the zoo owner. The foxes were impounded until a hearing could be held the next morning. After the hearing, the animals were killed. The zoo owner filed suit alleging a due-process violation. After a detailed discussion of the zoo owner's property interest in the foxes, which "was subject to the city's police

power," we concluded that the postdeprivation hearing was adequate, "particularly in light of the government's strong interest in public health and in the speedy resolution of rabies tests on the foxes." *Clark*, 168 F.3d at 1189-90.

In light of this precedent it cannot be denied that the City, acting through its inspectors, may close a restaurant to protect the health of patrons and workers without first providing a hearing to the restaurant owner. Indeed, Mr. Camuglia acknowledges the constitutionality of the ordinance under which Mr. Worthington acted, even though it provides for a hearing only *after* suspension of the permit. *See* Albuquerque Code ch. 9, § 9-6-1-13(C). What Mr. Camuglia complains about is that, in his view, Mr. Worthington had no basis for suspending the permit—Mr. Worthington was wrong about the health danger, perhaps even intentionally and maliciously wrong. As stated by his counsel at oral argument before the district court: "We're not challenging the constitutionality of the ordinance itself. We're contesting or challenging the manner in which it was applied in this particular instance, because there's no substantial hazard." Aplt. App. at 157; *see also id*. at 152 ("So under these circumstances he was denied due process procedurally, *because without an imminent danger*, he was entitled to a hearing." (emphasis added)). At one point in the hearing, counsel for Mr. Camuglia stated: "They can close [the restaurant] if there's an imminent danger, but if there's not an imminent danger, then [the Ordinance] provides differently." *Id*. at 154.

This argument misses the point. It concedes that limiting the owner to a postdeprivation hearing comports with due process when the government has acted properly, but contends that a predeprivation hearing is required when the government has erred. In other words, the government can delay the hearing until after the deprivation only when the deprivation was in fact lawful. We might ask why even a postdeprivation hearing is required in that circumstance, when one is conceding that the government did nothing wrong. The purpose of a hearing, after all, is to determine *whether* government conduct has been (or would be) unlawful. When the Supreme Court states that granting just a postdeprivation hearing is constitutionally adequate, it is saying that determining the propriety of government action can wait. As the Court wrote in *North American Cold Storage Co.*, 211 U.S. at 316:

> The *ex parte* finding of the health officers as to the fact [that food is contaminated] is not in any way binding upon those who own or claim the right to sell the food. If a party cannot get his hearing in advance of the seizure and destruction he has the right to have it afterward, which right may be claimed upon the trial in an action brought for the destruction of his property, and in that action those who destroyed it can only successfully defend if the jury shall find the fact of unwholesomeness, as claimed by them.

This is why the disputed facts here are irrelevant to the procedural-due-process claim. They relate only to whether Mr. Worthington was correct in his judgment that the ULD 300 was being improperly used and that the restaurant's permit should be temporarily suspended as a result. But they are irrelevant to

whether Mr. Camuglia was entitled to a hearing before suspension of his permit. The process one is due is not dependent on whether the government was right or wrong in the particular case but on whether, in general, constitutional norms require particular procedures to balance private and public interests. Postponing the hearing may, as Mr. Camuglia contends happened here, cause harm. The Supreme Court, however, has recognized that possibility and ruled that the public interest in prompt action permits that action to precede a hearing in public-health matters. Mr. Camuglia may have a remedy for a governmental error, but he cannot claim that he has been deprived of procedural due process.

### 3. Substantive Due Process

Nor can Mr. Camuglia prevail on a claim of a substantive-due-process violation. In his response to Mr. Worthington's motion for summary judgment, Mr. Camuglia contended below that Mr. Worthington's actions were "arbitrary, capricious and without a rational basis," because "there were no grounds upon which Defendants should have issued a citation and then notify the media that Paisano's had somehow become an unhealthy facility in which to eat." Aplt. App. at 77. The district court disagreed:

> Although Camuglia argues that Worthington was not using sound discretion, "the Due Process Clause 'is not a guarantee against incorrect or ill-advised [government] decisions.'" *Uhlrig v. Harder*, 64 F.3d [567,] 573 [(10th Cir. 1995)] (citing *Collins v. City of Harker Heights Tex.*, 503 U.S. [115,] 129 [1992]). Even if Worthington made a poor decision, Camuglia presents no evidence that Worthington's actions were arbitrary, capricious, or without a

rational basis. . . . Thus, Camuglia's allegations do not meet the high
standard that the Supreme Court set for substantive due process
claims in *County of Sacramento v. Lewis*[, 523 U.S. 833 (1998)].

*Camuglia*, 375 F.Supp.2d at 1309-1310.  In our view, the district court had it

right.

"An arbitrary deprivation of an individual's property right can violate the

substantive component of the Due Process Clause."  *Clark*, 168 F.3d at 1190.  But

the arbitrariness must be extreme.

The ultimate standard for determining whether there has been a
substantive due process violation is whether the challenged
government action shocks the conscience of federal judges.  It is well
settled that negligence is not sufficient to shock the conscience.  In
addition, a plaintiff must do more than show that the government
actor intentionally or recklessly caused injury to the plaintiff by
abusing or misusing government power.

*Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir. 2006) (internal quotation marks

and citations omitted).  "[T]he plaintiff must demonstrate a degree of

outrageousness and a magnitude of potential or actual harm that is truly

conscience shocking."  *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995).  This

is a "high level of outrageousness."  *Id*.  Establishing these limits advances

"three basic principles highlighted by the Supreme Court in evaluating

substantive due process claims:  (1) the need for restraint in defining their scope;

(2) the concern that § 1983 not replace state tort law; and (3) the need for

deference to local policymaking bodies in making decisions impacting upon

public safety."  *Id*. at 573 (internal citations omitted).

-17-

Even viewing the evidence in the light most favorable to Mr. Camuglia, we can say with confidence that he has not demonstrated a substantive-due-process violation. He does not contend that Mr. Worthington acted unreasonably when he first came to Paisano's and noted certain violations. Mr. Camuglia assured Mr. Worthington that they would be taken care of and invited him to return the next day. He did so, and became concerned about the application of the ULD 300. He spoke with his supervisor and they agreed to suspend the restaurant's permit temporarily. The restaurant was shut down for only one day, and the permit was immediately restored once contaminated food had been disposed of and food-preparation surfaces had been cleaned. As for notification to the media, the ordinance requires that the inspection report "be made available for public disclosure . . . to any person who requests it." Albuquerque Code ch. 9, § 9-6-1-12(C), and, after repeated requests by media outlets for the reports, the City had adopted a policy of automatically faxing them to the media. Thus, sending the report to the media was a routine part of Mr. Worthington's job. The conduct of Mr. Worthington does not shock the conscience.

## B. Claims Against the City

Only individuals, not municipalities, are protected by qualified immunity. The City may be liable even if Mr. Worthington is not:

> While it would be improper to allow a suit to proceed against the city if it was determined that the officers' action did not amount to a constitutional violation, there is nothing anomalous about allowing

such a suit to proceed when immunity shields the individual defendants. The availability of qualified immunity does not depend on whether a constitutional violation has occurred. While a government official who violates the constitution will be protected if his or her actions were reasonable in light of clearly established law and the information the official possessed when he or she acted, municipalities enjoy no such shield.

*Watson v. City of Kansas City, Kan.*, 857 F.2d 690, 697 (10th Cir. 1988) (internal citation omitted). Here, however, we have determined that there was no constitutional violation. "A municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993). The City was therefore also entitled to summary judgment.

## III. CONCLUSION

We AFFIRM the summary judgment granted by the district court.