**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**March 3, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

BRUCE ADAMS, d/b/a Southwest
Safaris,

 Petitioner,

v.

FEDERAL AVIATION
ADMINISTRATION; NATIONAL
PARK SERVICE,

 Respondents.

No. 24-9528

_____

**On Petition for Review of an Order by the Federal Aviation**
**Administration and the National Park Service**
_____

Submitted on the Briefs:[*]

Bruce Adams, d/b/a Southwest Safaris, Santa Fe, New Mexico, *pro se*.

Adam R.F. Gustafson, Acting Assistant Attorney General, Justin D. Heminger, Mary Gabrielle Sprague, Kyle Glynn, and Rebecca Jaffe, Attorneys, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C., for Respondents.
_____

Before **PHILLIPS, ROSSMAN, and FEDERICO**, Circuit Judges.
_____

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f). The case is therefore ordered submitted without oral argument.

_____

**ROSSMAN**, Circuit Judge.

_____

Bruce Adams, doing business as Southwest Safaris and proceeding *pro se*,[1] petitions this court to review an order by the Federal Aviation Administration (FAA) and National Park Service (NPS, and collectively, the Agencies) issuing an Air Tour Management Plan (ATMP) for Bandelier National Monument under 49 U.S.C. § 40128(b)(5). Exercising jurisdiction under 49 U.S.C. §§ 40128(b)(5) and 46110(a), we deny the petition for review.

**I**

**A**

The National Parks Air Tour Management Act of 2000 (NPATMA), 49 U.S.C. § 40128, allows the Agencies to regulate commercial air tour flights over national parks and tribal lands throughout the United States. As relevant here, NPATMA requires the Agencies to "establish an air tour management

---

[1] Because Mr. Adams proceeds *pro se*, we liberally construe his filings, but "this rule of liberal construction stops . . . [when] we begin to serve as his advocate." *United States* v. *Pinson*, 584 F.3d 972, 975 (10th Cir. 2009). Notably, this court issued an order inviting Mr. Adams to consider receiving pro bono counsel in this matter, pursuant to Tenth Circuit Rules. Mr. Adams declined the invitation, stating he "simply prefers to argue on [his] own behalf." *Adams* v. *FAA*, No. 24-9528, Dkt. No. 73, at 1 (10th Cir. Apr. 11, 2025).

2

plan for any national park or tribal land . . . whenever a person applies for authority to conduct a commercial air tour operation over the park." *Id.* § 40128(b)(1)(A). NPATMA states "[t]he objective" of every ATMP "shall be to develop acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of commercial air tour operations upon the natural and cultural resources, visitor experiences, and tribal lands." *Id.* § 40128(b)(1)(B). To address "significant adverse impacts," the Agencies have several options. An ATMP may prohibit air tour operations "in whole or in part." *Id.* § 40128(b)(3)(A). Or an ATMP may impose other measures, including limitations on routes, flight altitude, and flight times. *See id.* § 40128(b)(3)(B).

In September 2021, the Agencies publicly released a draft ATMP allowing air tours over Bandelier, a roughly 34,000-acre site in northern New Mexico.[2] After releasing the draft ATMP, the Agencies consulted with over two dozen Native American tribes connected to Bandelier culturally, historically, geographically, or spiritually. The tribes "unequivocally stated that air tours are inappropriate and adversely impact the cultural resources

---

[2] The parties do not dispute NPATMA covers national monuments, like Bandelier, which are managed by the NPS and constitute part of its National Park Unit. *See United States* v. *California,* 436 U.S. 32, 40 (1978) ("Reservation of federally controlled public lands for national monument purposes has the effect of placing the area reserved under the supervision, management, and control of the Director of the National Park Service." (internal quotation marks omitted)).

[of Bandelier], the cultural landscape and, in some cases, violate their privacy during the ceremonial use of the land." RI.12. In response to these and other concerns, the Agencies considered "reasonable alternatives" to allowing air tours over Bandelier. RI.6.

The Agencies also prepared an environmental assessment (EA) under the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, 42 U.S.C. § 4321 *et seq.*[3] The EA evaluated three alternatives:

---

[3] When a federal agency undertakes "major Federal actions significantly affecting the quality of the human environment," NEPA requires the agency to prepare a "detailed statement" on "reasonably foreseeable environmental effects of the proposed agency action"; "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented"; "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the of the proposal"; "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and "any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented." 42 U.S.C. § 4332(2)(C). This is known as an environmental impact statement (EIS). *Id.* § 4336e(6); *see also id.* § 4336(b)(1) ("An agency shall issue an environmental impact statement with respect to a proposed agency action requiring an environmental document that has a reasonably foreseeable significant effect on the quality of the human environment."). However, if an agency is unsure whether the environmental impact of a federal action will trigger the EIS requirement, the agency can first prepare an EA, a "concise public document" designed to assess the environmental impact of an agency action and the necessity of an EIS. *Id.* § 4336(b)(2); *see Badger Helicopters Inc.* v. *FAA*, 154 F.4th 902, 913 n.2 (8th Cir. 2025) (explaining the distinction between an EA and an EIS); *Marin Audubon Soc'y* v. *FAA*, 121 F.4th 902, 906–07 (D.C. Cir. 2024)

4

- *Alternative 1*: allow air tours under interim operating authority without additional conditions.

- *Alternative 2*: prohibit air tours over Bandelier.

- *Alternative 3*: restrict the number of air tour operations within Bandelier to 101 commercial air tours per year and reduce the number of routes flown by commercial air tour operators (ATOs) over Bandelier from seven to two.

The Agencies rejected Alternatives 1 and 3. In their view, those options "would result in unacceptable impacts to the Park's natural and cultural resources, [w]ilderness character, and visitor enjoyment[.]" RI.11. In 2023, the Agencies issued a new draft ATMP incorporating input from tribes and the public. The new draft ATMP adopted Alternative 2, proposing a flat prohibition on air tours over Bandelier. The Agencies received over 1,000 comments on the 2021 draft plan but only 28 comments on the 2023 draft plan.

The Agencies issued the final ATMP (Final ATMP) on February 29, 2024. It prohibited all commercial air tours over Bandelier. The Agencies also issued a record of decision (ROD) discussing the process behind the Final ATMP, sharing factfinding from the Agencies' consultations with tribes and the public and providing reasons for the Final ATMP's prohibition on air tours. The ROD concluded air tours adversely impact "cultural practices, sacred sites, and the

---

(similar). Here, the Agencies prepared an EA for the Bandelier ATMP and determined no EIS was necessary.

cultural landscape of the Park." RI.36. "Many tribes consider the entire landscape of the Pajarito Plateau, including the sky above, to be sacred[,]" the ROD explained, and these tribes "believe air tours are inappropriate and constitute an adverse effect to the cultural landscape, wildlife, and plants." RI.37. According to the Agencies, allowing any air tours under these circumstances "would be inconsistent with [Bandelier's] purpose and values, which include preserving tribal privacy regarding the conduct of traditional uses." RI.36.

## B

Bruce Adams operates Southwest Safaris, a single-pilot air carrier. Since 1974, Mr. Adams has led educational air tours across the American Southwest. Before Congress enacted NPATMA in 2000, Mr. Adams was the only operator leading commercial air tours over Bandelier. In 2005, the Agencies granted Mr. Adams interim authority to conduct up to 126 flights per year over Bandelier while the Agencies completed the ATMP. From 2017 to 2019, Mr. Adams conducted an average of 101 air tours over Bandelier each year. Mr. Adams says his air tour routes over Bandelier are "carefully designed . . . to minimize, if not eliminate, any objectionable noise impact on people who are on the ground." RI.81–82. He flies over Bandelier primarily to take off and land at the Santa Fe Regional Airport and estimates his flights over Bandelier last on average only two minutes. And Southwest Safaris, he

6

adds, does not "circle any landmark or in any way draw attention to the fact that an air tour is being conducted." RI.83.

Mr. Adams has long believed banning flights over Bandelier will negatively impact the safety of his air tours. During the 2023 drafting process, he extensively communicated with the Agencies, meeting with them twice virtually and submitting ten letters arguing the ATMP should allow flights over Bandelier.

On April 24, 2024, Mr. Adams filed a timely petition in this court for review of the Final ATMP. Federal law allows "a person disclosing a substantial interest in an order issued by" the FAA to "apply for review of the order by filing a petition for review in . . . the court of appeals of the United States for the circuit in which the person resides or has its principal place of business." 49 U.S.C. § 46110(a); *see also id.* § 40128(b)(5) ("An [ATMP] developed under this subsection shall be subject to judicial review.").[4] Because Southwest Safaris has its principal place of business in New Mexico, we have jurisdiction to review the petition. *See* 49 U.S.C. § 46110(a); *id.* § 40128(b)(5);

---

[4] Mr. Adams also petitions this court to review (i) the draft ATMP for Bandelier; (ii) the associated draft and final EAs; and (iii) NPATMA. The draft ATMP and draft EAs are not a "final agency action" sufficient to satisfy our jurisdiction, nor does Mr. Adams argue otherwise. *See Colo. Farm Bureau Fed'n* v. *U.S. Forest Serv.*, 220 F.3d 1171, 1173–74 (10th Cir. 2000) (discussing finality for purposes of Administrative Procedure Act review and stating plaintiffs bear the burden of explaining finality).

*Badger Helicopters Inc.* v. *FAA*, 154 F.4th 902, 909 (8th Cir. 2025) (also finding jurisdiction to review a final ATMP under §§ 46110 and 40128(b)(5)).

## II

In his petition for review, Mr. Adams challenges the Final ATMP and NPATMA itself. His main argument is the Final ATMP violates NPATMA and therefore is "not in accordance with law" as required by the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A). Under the APA, we generally review agency action to assess whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). "[W]hen an agency interprets a statute, judicial review of the agency's interpretation is *de novo*." *Seven Cnty. Infrastructure Coal.* v. *Eagle County*, 605 U.S. 168, 179 (2025). We "may not defer to an agency interpretation of the law." *Loper Bright Enters.* v. *Raimondo*, 603 U.S. 369, 413 (2024); *see 3484, Inc.* v. *NLRB*, 137 F.4th 1093, 1103–04 (10th Cir. 2025) (explaining, after *Loper Bright*, "deference is no longer owed" to an agency's interpretation of the law). Applying these standards to the record before us, we cannot conclude the Final ATMP violates NPATMA.

## A

According to Mr. Adams, the Agencies must find "significant adverse impacts" before prohibiting air tours under NPATMA. We agree. NPATMA says, "The objective of any air tour management plan shall be to develop

acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of commercial air tour operations upon the natural and cultural resources, visitor experiences, and tribal lands." 49 U.S.C. § 40128(b)(1)(B).[5] The statutory text confirms a finding of "significant adverse impacts" under NPATMA, *see id.*, is required to justify restrictions on commercial air tours in an ATMP. The Agencies concede as much.

Mr. Adams claims the Agency impermissibly banned all air tours in Bandelier without making the requisite significance finding under NPATMA. In support, Mr. Adams points to the ROD, which says the Agencies "did not find . . . that impacts arose to the level of significance. Therefore, there would be no significant impacts to cultural resources for any of the [three] alternatives." RI.26. Mr. Adams thus claims the Agencies have admitted they failed to find NPATMA-significance.

In response, the Agencies first contend Mr. Adams misreads the ROD. We agree. The part of the ROD cited by Mr. Adams refers to *NEPA*, not NPATMA. The ROD states, "[U]nder *NEPA* . . . there would be no significant impacts to cultural resources for any of the alternatives." RI.26 (emphasis added). The finding at issue comes in a subsection labeled "The

---

[5] NPATMA presents an exception, not relevant here, for Crater Lake National Park and Great Smoky Mountains National Park. *See* 49 U.S.C. § 40128(b)(1)(C).

FAA's Finding of No Significant Impact"—a NEPA term of art. RI.19 (bolding omitted); *see also Dep't of Transp.* v. *Pub. Citizen*, 541 U.S. 752, 757 (2004) (explaining the significance of terms used in NEPA regulations). That subsection is part of a larger section labeled "Environmental Consequences," which also includes a subsection called "The NPS's Finding of No Significant Impact under *NEPA*." RI.15 (emphasis added) (bolding omitted). And the final section of the ROD, titled "Decision and Order," concludes that "[a]fter careful and thorough consideration of the facts herein . . . the FAA finds that the Preferred Alternative is consistent with existing national environmental policies and objectives[.]" RI.39 (bolding omitted).

These findings under NEPA raise the question: are the significance standards in NEPA and NPATMA the same?[6] Mr. Adams insists a finding of no significant impacts for purposes of NEPA necessarily means the significance threshold for NPATMA is not met. In his view, NPATMA sets

---

[6] On April 22, 2025, we ordered supplemental briefing so the parties could address three questions: (1) whether NPATMA requires a finding of "significant adverse impacts" in order to justify restrictions on commercial air tours in an ATMP, 49 U.S.C. § 40128(b)(1)(B); (2) whether a finding of no significance for purposes of NEPA informs whether those adverse impacts reach the significance threshold for purposes of NPATMA; and (3) whether the ROD contains a reasonably discernible path to finding significant adverse impacts under NPATMA. As we have already explained, the parties agree on the first question. The dispute now centers on the second and third questions.

a higher bar than does NEPA. The Agencies disagree. A no-significant-impacts finding under NEPA, the Agencies argue, "does not preclude a finding under [NPATMA] that air tours caused significant adverse impacts to a park and its resources." Resp. Br. at 49–50 (citing 49 U.S.C. § 40128(b)(1)(B)). "Congress set a higher bar for NEPA significance than for NPATMA significance—in other words, the same impact might be significant under NPATMA but not significant under NEPA." Resps. Supp. Br. at 6. The Agencies acknowledge the ROD "did not explicitly state that the adverse impacts from air tours were 'significant' under [NPATMA]." Resp. Br. at 27–28. But the Agencies insist the "path" to finding significant adverse cultural impacts "can reasonably be discerned from the extensive discussion of the adverse impacts of air tours" in the ROD. Resp. Br. at 27–28 (citing RI.35–39). We now consider these questions.

**B**

We must first decide whether the statutory term "significantly" in NEPA means the same thing as the statutory term "significant" in NPATMA. Reviewing de novo, we answer *no*.

NPATMA requires federal agencies to create ATMPs "to mitigate or prevent the *significant* adverse impacts, if any, of commercial air tour operations upon the natural and cultural resources, visitor experiences, and tribal lands." 49 U.S.C. § 40128(b)(1)(B) (emphasis added). And NEPA

11

requires federal agencies to prepare an EIS for "major Federal actions *significantly* affecting the quality of the human environment[.]" 42 U.S.C. § 4332(2)(C) (emphasis added).

Under our precedent, NEPA-significance "is determined by looking at both the context of the action and its intensity." *Middle Rio Grande Conservancy Dist.* v. *Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002) (citing 40 C.F.R. § 1508.27); *accord Ctr. for Biological Diversity* v. *U.S. Dep't of the Interior*, 72 F.4th 1166, 1188 (10th Cir. 2023). But we have not yet had occasion to analyze the meaning of the term "significant" in NPATMA.[7] That NEPA uses the adverb "significantly" and NPATMA uses the adjective

---

[7] Federal regulations previously required agencies to consider ten factors when assessing intensity, including "[t]he degree to which the proposed action affects public health or safety[,]" the "[u]nique characteristics of the geographic area[,]" "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial[,]" and "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(2)–(b)(5) (1978), *removed by* Removal of Nat'l Env't Policy Act Implementing Reguls., 91 Fed. Reg. 618-01 (Jan. 8, 2026). Even if our pre-*Loper Bright* precedent may have relied on agency interpretations to define "significantly" under NEPA, the parties neither argue we should reconsider NEPA-significance in light of *Loper Bright* nor press any other arguments suggesting this court has misunderstood NEPA-significance. We thus have no cause to reach such arguments in this case. *See United States* v. *Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("[I]n both civil and criminal cases, in the first instance and on appeal . . . we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." (quoting *Greenlaw* v. *United States*, 554 U.S. 237, 243 (2008))).

"significant" does not resolve whether the test for significance is identical in both statutory contexts. These are different words in different statutes, so we do not presume they carry the same meaning. Ultimately, we must "take into account the broader context of the statute as a whole when ascertaining the meaning of a particular provision." *Conrad* v. *Phone Directories Co.*, 585 F.3d 1376, 1381 (10th Cir. 2009) (internal quotation marks omitted); *see also Env't Def.* v. *Duke Energy Corp.*, 549 U.S. 561, 576 (2007) ("Context counts.").

The text and contexts here persuade us that "significant" under NPATMA has a different meaning than "significantly" under NEPA. *See West Virginia* v. *EPA*, 597 U.S. 697, 721 (2022) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (internal quotation marks omitted)); *Russello* v. *United States*, 464 U.S. 16, 23 (1983) (concluding the phrase "any interest . . . acquired" has a different meaning than "any interest in . . . any enterprise which [the defendant] has established[,] operated, controlled, conducted, or participated in" (alterations in original) (internal quotation marks omitted)). NPATMA considers "significant adverse impacts" to the "cultural resources, visitor experiences, and tribal lands" of a national park. 49 U.S.C. § 40128(b)(1)(B). NEPA considers "significant effect[s] on the quality of the human

13

environment." 42 U.S.C. § 4336(b)(1). As the Agencies observe, the legislative history of NPATMA suggests Congress considered "significant adverse impacts" under NPATMA to "include impacts that compromise or otherwise negatively affect the abilities of ground visitors to experience the sounds of the national park unit in its intended context." S. Rep. No. 106-9, at 46 (1999). Under these distinct standards, an action might be NPATMA-significant if it greatly affects cultural resources or visitor experiences, but not NEPA-significant if it does not greatly affect "the quality of the human environment." 42 U.S.C. § 4336(b)(1).

The Agencies provide a useful example. An air tour that causes an irritating noise may be NPATMA-significant by impairing visitor experiences or disturbing cultural resources on the ground. Yet this noise might not be NEPA-significant if, for example, it does not affect public health, does not raise the possibility of unknown potential effects on the human environment, or creates no public controversy. *See Middle Rio Grande Conservancy*, 294 F.3d at 1229; *Ctr. for Biological Diversity*, 72 F.4th at 1188.

This example is hardly a hypothetical. During deliberations over the Bandelier ATMP, tribes told the Agencies that commercial air tours "unreasonably interfere[] with tribal connections to the sacred landscape of

14

[Bandelier] primarily due to tribal concerns about privacy." RI.466. The disruption comes from both visual observation and auditory intrusions:

> Tribal dances are religious ceremonies which may be practiced on tribal land or in [Bandelier, and] are not public performances. It is a privilege to witness a ceremony. Silence is mandatory during all dances and pueblo ceremonies. Commercial air tours may interrupt these cultural and religious practices with noise, but primarily interrupt these practices by their physical presence and invasion of privacy which denigrates the sacred space that the Park protects.

RI.466. A noisy air tour—even for a short duration—provides a clear illustration of a significant adverse impact on cultural resources and visitor experiences, thus satisfying NPATMA-significance without necessarily triggering NEPA-significance. We thus hold that a finding of no significant adverse impacts under NEPA does not necessarily mean there was a finding of no significant adverse impacts under NPATMA.

## C

Recall, as the Agencies acknowledge, the ROD neither outright states the impacts of air tours are significant for purposes of NPATMA nor explains that NEPA-significance and NPATMA-significance are different. We thus consider whether there is a reasonably discernable path to a finding of NPATMA-significance in the agency record to justify the ATMP. We answer *yes*.

Under the APA, we review the "whole record" when assessing agency action. *Ballard* v. *Comm'r of Internal Revenue*, 544 U.S. 40, 62 (2005) (quoting 5 U.S.C. § 706). "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). A reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* at 43. And we "may not accept appellate counsel's *post hoc* rationalizations for agency action." *Id.* at 50. We ask not whether we "agree[] with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 180. We "*must* uphold even a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Garland* v. *Ming Dai*, 593 U.S. 357, 369 (2021) (emphasis added) (internal quotation marks omitted). A reasonably discernible path exists when the agency's explanation is "clear enough." *Encino Motorcars, LLC* v. *Navarro*, 579 U.S. 211, 221 (2016). We carefully abide by these principles here.

Mr. Adams argues no "reasonable" path to NPATMA-significance exists in the Agencies' record. The Agencies acknowledge "[t]he record is imperfect." Resps. Supp. Br. at 12. Still, the Agencies insist their path to a finding of NPATMA-significance "can be reasonably discerned" because of

16

the several adverse cultural impacts identified throughout the ROD. Resps. Supp. Br. at 10–11. We agree.

The relevant section in the ROD is titled, "Basis and Justification for the Decision [to Ban Air Tours over Bandelier]." RI.35 (bolding omitted). There, the Agencies explain the Final ATMP "maintain[s] confidentiality of sacred sites, respect[s] the spiritual significance of [Bandelier] to tribal people, maintain[s] cultural connections to [Bandelier], respect[s] privacy for tribes during traditional uses and ceremonies within the ATMP boundary, and prioritize[s] elevating the voices and values of tribal nations." RI.35. The ROD also states the Final ATMP "protect[s] . . . cultural resources, including sacred sites, ancestral sites, cultural landscapes, and traditional cultural properties, all of which include the natural resources within[.]" RI.35. And the decision, the Agencies add, "also reduces impacts to [w]ilderness and visitor experience." RI.36.

The ROD proceeds to evaluate how protecting "cultural resources" is consistent with NPS's Organic Act, which established the National Park Service, 54 U.S.C. § 100101 *et seq.* According to the ROD, public comments and tribal consultations revealed the "existing number of air tours on existing routes had too great of an impact to cultural practices, sacred sites, and the cultural landscape of [Bandelier]." RI.36. Subsequent paragraphs mention "cultural sites within [Bandelier] associated with Native American

17

Tribes"; "cultural heritage of pueblos, ceremonial dances, [and] traditional events, among other events and activities"; "tribal privacy"; "tribal connections to the sacred landscape of [Bandelier]"; and more. RI.36; *see also* RI.37–38 (discussing cultural concerns and considerations). A "refrain" of adverse impacts to cultural resources "resonates" throughout the record. *Ctr. for Biological Diversity*, 72 F.4th at 1181.

The agency decision here is less than ideally clear, but that does not affect the bottom line. The record confirms the Agencies' finding that cultural impacts were not "significant" was limited to NEPA. And we conclude it is reasonably discernible that the Agencies—in repeatedly emphasizing cultural concerns—found these concerns to be NPATMA-significant.

## D

Mr. Adams raises several other unavailing challenges to the Final ATMP and NPATMA.

## 1

Mr. Adams contends the Agencies' decision to prohibit air tours over Bandelier is "arbitrary" or "capricious" in violation of § 706(2)(A). In his view, the Final ATMP is "unwarranted by the facts," Op. Br. at 7 (quoting 5 U.S.C. § 706(2)(F)), because the "FAA's theories of sound & presence are fundamentally wrong, according to physics and math," Op. Br. at 7 (bolding

18

omitted). Mr. Adams seems to object to what he describes as the FAA's "ill-founded environment theory," Op. Br. at 18 (bolding omitted), which he says is contradictory, inconsistent, arbitrary, and capricious, *see* Op. Br. at 18–19.

As a general matter, we will find an agency decision arbitrary or capricious when the agency

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also* 5 U.S.C. § 706(2)(A). But we need not reach the merits of Mr. Adams's APA arguments—even liberally construed—because they are inadequately developed. *See United States* v. *Pinson*, 584 F.3d 972, 975 (10th Cir. 2009) (explaining the "rule of liberal construction stops . . . at the point at which we begin to serve as [the *pro se* litigant's] advocate"); *Garrett* v. *Selby Connor Maddux & Janer*, 425 F.3d 836, 841 (10th Cir. 2005) (explaining we cannot craft arguments on behalf of *pro se* litigants).

Mr. Adams devotes much of his opening brief to points about "science-based sound studies" and refutations of "noise modeling." But these arguments fail to address the Agencies' finding that air tours create

significant adverse impacts on cultural resources *regardless* of the intensity or duration of the overhead air tours. *See Seven Cnty. Infrastructure Coal.*, 605 U.S. at 182 ("Black-letter administrative law instructs that when an agency . . . decides what qualifies as significant or feasible or the like, a reviewing court must be at its most deferential." (internal quotation marks omitted)). For example, the ROD discusses a variety of "cultural resources" at Bandelier that Native tribes consider "sacred," including "archeological sites, sacred sites, ancestral sites, cultural landscapes, and traditional cultural properties[.]" RI.36. The ROD explains the "physical presence" of commercial air tours "interrupt" cultural practices at these sites and "denigrates the sacred space that [Bandelier] protects." RI.37.

Mr. Adams seems to argue the Agencies' conclusion—which he calls the "Theory of Mere Presence"—is arbitrary and capricious because the Agencies took a different position in an ATMP issued for Hawaiʻi Volcanoes National Park (HAVO). Even assuming Mr. Adams correctly summarizes an ATMP governing HAVO, his argument is illogical. He does not explain why it is arbitrary or capricious for the Agencies to conclude air tours create significant adverse impacts at one park (given that particular park's unique cultural resources), but not at another park (given that particular park's *different* unique cultural resources). Mr. Adams says "[e]very park is not 'different' re[garding] law." Op. Br. at 22. Yet every park might be different

regarding *facts*. *Cf.* ROBERT L. GLICKSMAN, 1 PUB. NAT. RES. L. § 7:3 (2025) (discussing how the NPS and other agencies involve "local officials deciding local questions on the basis of local conditions"). As the Agencies explain, "each Park has unique purposes, fundamental values, and resources." Resp. Br. at 46. Hence why "the same criteria at both Bandelier and [other parks]" could lead the Agencies to "develop[] different air tour management plans" at each park. Resp. Br. at 46. "Section 706 *does* mandate that judicial review of agency . . . factfinding be deferential." *Loper Bright*, 603 U.S. at 392. Mr. Adams does not persuade us that the Agencies' extensive factfinding merits anything but such deference.

## 2

Mr. Adams next claims the Final ATMP violates NEPA and the National Historic Preservation Act (NHPA), 54 U.S.C. § 306108. We reject these arguments.

Recall, NEPA requires federal agencies to prepare "a detailed statement" assessing the environmental effects of all "major Federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(2)(C). NHPA requires federal agencies to "take into account" the effect of a proposed federal or federally assisted "undertaking" on any historic property. 54 U.S.C. § 306108. The term "undertaking" means "a project, activity, or program funded in whole or in part under the direct or

21

indirect jurisdiction of a Federal agency, including . . . those requiring a Federal permit, license, or approval[.]" *Id.* § 300320(3). Because NEPA and NHPA lack an express cause of action, this court reviews the Agencies' compliance with those laws under the APA, 5 U.S.C. § 706(2)(A). *See, e.g.*, *Diné Citizens Against Ruining Our Env't* v. *Bernhardt*, 923 F.3d 831, 839 (10th Cir. 2019) ("Neither NEPA nor NHPA 'provide[s] a private right of action,' so we review the . . . decisions [at issue] as 'final agency action[s] under the' APA." (fourth alteration in original) (internal quotation marks omitted)).

Mr. Adams claims NPATMA requires the Agencies to conduct "noise tests" before the Agencies' actions "under NHPA and NEPA can[] *legally* proceed." Op. Br. at 32. Mr. Adams also argues the Agencies should not have applied NHPA because the statute requires a "legal undertaking" and an ATMP is not a "legal undertaking" subject to the statute. Op. Br. at 31–34; *see* 54 U.S.C. §§ 300320(3), 306108. "[T]he FAA's Section 106 and NEPA EA initiatives," Mr. Adams contends, "are not in compliance with law and the ATMP process must be halted, [NPATMA] being the controlling legal authority." Op. Br. at 34.

The Agencies maintain they followed both NEPA and NHPA in crafting the Final ATMP, as required by law. On the record before us, we agree.

22

"Under NEPA, an agency's only obligation is to prepare an adequate [EIS]." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 180; *see also id.* at 173 (stating "NEPA is a purely procedural statute" that "imposes no substantive environmental obligations or restrictions"). Section 106 of NHPA requires agencies to "take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108. By contrast, NPATMA requires Agencies to "develop acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of commercial air tour operations." 49 U.S.C. § 40128(b)(1)(B). In developing the Final ATMP, the Agencies prepared a detailed EA under NEPA, and under NHPA, they consulted a New Mexico state historic preservation officer, many tribes, and Mr. Adams. We discern no error.

**3**

We next consider Mr. Adams's constitutional challenges to NPATMA. Mr. Adams argues NPATMA violates the separation of powers as an impermissible delegation from Congress to the Agencies. He says NPATMA's delegation to the Agencies lacks an "intelligible principle." Reply Br. at 34 (citing *Gundy* v. *United States*, 588 U.S. 128 (2019) (plurality opinion)). He also insists NPATMA violates his First Amendment rights to speech and expression. Last, he argues NPATMA violates the Commerce Clause "because it gives preference . . . to the Ports . . . airports

23

being the equivalent of seaports . . . of some states over those of others[.]" Op. Br. at 44 (first ellipsis added). The Agencies counter we need not reach the merits of these arguments: Mr. Adams never presented his constitutional arguments about NPATMA to the Agencies, and so he forfeited these arguments for failing to administratively exhaust them.

We agree with the Agencies. "[E]xhaustion of APA claims is generally required[.]" *Gilmore* v. *Weatherford*, 694 F.3d 1160, 1166 (10th Cir. 2012) (citing *Darby* v. *Cisneros*, 509 U.S. 137, 146 (1993)). "A party challenging an agency action often must *first* raise its objection to that agency—not a federal court." *W. Watersheds Project* v. *U.S. Bureau of Land Mgmt.*, 76 F.4th 1286, 1293 (10th Cir. 2023). "To satisfy the exhaustion requirement, plaintiffs generally must structure their participation so that it alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration." *Id.* (internal quotation marks omitted). "We enforce the exhaustion requirement for good reason. The requirement turns on the principle that 'agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer.'" *Id.* at 1294 (quoting *McCarthy* v. *Madigan*, 503 U.S. 140, 145 (1992), *superseded by statute on other grounds as recognized in Booth* v. *Churner*, 532 U.S. 731, 739–40 (2001)); *see also Harline* v. *DEA*,

24

148 F.3d 1199, 1203 (10th Cir. 1998) (discussing the rationales for the administrative exhaustion requirement).

Mr. Adams failed to raise his nondelegation, First Amendment, and Commerce Clause arguments before the Agencies. He submitted ten letters to the Agencies. Nowhere did he argue NPATMA lacked an intelligible principle, that he had a protected First Amendment interest in his air tours, or that NPATMA violates the Commerce Clause. Because Mr. Adams failed to "alert[] the agenc[ies] to [his] position and contentions," he has "failed to exhaust [his] administrative remedies" and "has consequently forfeited [his] argument[s]."[8] *W. Watersheds Project*, 76 F.4th at 1293 (internal quotation marks omitted). Mr. Adams provides no reason this court should nonetheless consider his forfeited arguments.

**4**

---

[8] Further, even if we overlooked Mr. Adams's failure to administratively exhaust, we would still decline to reach his constitutional challenges to NPATMA due to inadequate briefing. Mr. Adams develops his nondelegation, First Amendment, and Commerce Clause claims in only a few sentences of his opening brief. Cursory discussion on appeal fails to preserve an argument. *See Harsco Corp.* v. *Renner*, 475 F.3d 1179, 1190 (10th Cir. 2007) ("[A] party waives those arguments that its opening brief inadequately addresses."). This rule applies to *pro se* and counseled litigants alike. *See Merryfield* v. *Jordan*, 584 F.3d 923, 925 n.2 (10th Cir. 2009) (concluding a *pro se* litigant waived issues "due to a wholesale lack of reasoned argument").

Finally, we reach the remaining constitutional challenges advanced by Mr. Adams. He argues the Final ATMP violates his Fifth Amendment rights to due process and equal treatment. As for his due-process claim, Mr. Adams contends the Agencies failed to conduct sufficient consultations and studies on impacts at Bandelier. "Without these tests, studies, and consultations," Mr. Adams insists, "ATOs are deprived of objective data and argument that they can take to court to challenge the [A]gencies' findings." Op. Br. at 39. His equal-treatment claim relies on supposed differential treatment between charter flights and air tours: "Charter flights are allowed to navigate the airspace over national parks but not ATOs, though flying in identical manner." Op. Br. at 44. Mr. Adams also argues the Final ATMP violates the Ex Post Facto Clause because it "alter[s] the rules of evidence under NHPA regulations after a supposed offense was committed . . . so that it is easier to convict [Southwest Safaris] without any evidence at all." Op. Br. at 44–45. The Agencies respond these arguments all fail, either for inadequate briefing or on the merits.

Again, we must agree with the Agencies. Mr. Adams advances his due-process challenge in one paragraph of his opening brief, with no meaningful analysis or argument. "Arguments inadequately briefed in the opening brief are waived[.]" *Adler* v. *Wal–Mart Stores, Inc.,* 144 F.3d 664, 679 (10th Cir. 1998). Even construing Mr. Adams's brief liberally, we cannot conclude the argument is adequately developed. We have routinely held we "will not

26

consider such issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation[.]" *United States* v. *Clay*, 148 F.4th 1181, 1201 (10th Cir. 2025) (internal quotation marks omitted). That is the case here.[9]

Mr. Adams similarly presses his equal-treatment and ex post facto claims in a single paragraph of his opening brief. He develops each claim perfunctorily, in only a sentence or two. *See Menzies* v. *Powell*, 52 F.4th 1178, 1227 (10th Cir. 2022) (concluding "a single sentence" of argument "does not adequately develop a distinct appellate challenge"). And he does not cite the record to support his many factual contentions. "[T]his court has repeatedly insisted that pro se parties follow the same rules of procedure that govern other litigants." *Garrett*, 425 F.3d at 840 (internal

---

[9] In any event, on the record before us and based on the arguments presented, we discern no Fifth Amendment procedural due process problem. Precedent instructs "due process is flexible and calls [only] for such procedural protections as the particular situation demands." *Camuglia* v. *The City of Albuquerque*, 448 F.3d 1214, 1220 (10th Cir. 2006) (alteration in original) (quoting *Mathews* v. *Eldridge*, 424 U.S. 319, 334 (1976)). NPATMA requires agencies establishing an ATMP to "hold at least one public meeting with interested parties to develop the [ATMP]" and "publish the proposed [ATMP] in the Federal Register for notice and comment and make copies of the proposed plan available to the public[.]" 49 U.S.C. § 40128(b)(4)(A)–(B). The Agencies complied with these requirements. They held several public meetings, published the proposed plan in the Federal Register, responded to and considered each of Mr. Adams's letters, and held two virtual meetings with Mr. Adams.

quotation marks omitted). Those rules require an appellant to support his arguments "with citations to the authorities and parts of the record on which the appellant relies." *Id.* at 840–41 (quoting Fed. R. App. P. 28(a)(8)(A)). Consistent with circuit practice, we decline to consider Mr. Adams's inadequately developed arguments.[10]

### III

We **DENY** the petition for review.

---

[10] Mr. Adams also argues the Agencies "knowingly deceived" and "defrauded" the U.S. Court of Appeals for the D.C. Circuit by "withholding critical information that the court requested." Op. Br. at 43. We see no basis for this contention or reason to grant the petition based on this argument.

28